THEOPHILUS WHITE v. H. W. AYER, State Auditor, and W. H. WORTH, State Treasurer.

(Decided May 22, 1900.)

*Chief Inspector of Shell Fish, Act of 1897, Chapter 18— Shell Fish Commissioners, Act 1899, Chapters 18, 19, 21—Salary—Mandamus—White v. Hill, 125 N. C., 194.*

1. The plaintiff's office of Chief Inspector of Shell Fish, to which he was appointed under the Legislature of 1897, still exists, and having performed its duties he is entitled to compensation.

2. While the office was not abolished by the Legislature of 1899, the effect of it was to reduce the compensation to $400 per annum, and 5 cents per mile travel, when engaged in his work, and extra expenses not to exceed $50 per annum.

3. As the prescribed manner of issuing the warrant can not be literally complied with, it should be conformed to, "as near as may be;" that is, the certificate should be issued by the clerk of the present board, and countersigned by the plaintiff, as chairman, and the Auditor's warrant should issue upon this certificate.

CONTROVERSY SUBMITTED WITHOUT ACTION, under The Code, secs. 567 and 568, to *Starbuck, J.,* holding the Superior Court of PERQUIMANS County, and determined December 4, 1899.

Upon the facts agreed, which are copied into the opinion, his Honor rendered the following judgment:

This cause coming on to be heard before *Starbuck, J.,* upon the facts agreed, it appears that the Supreme Court, in the cause entitled *State ex rel. Theophilus White v. George H. Hill et al.,"* has held that chap. 19, Public Laws of 1899, is void in so far as it undertakes to appoint the persons therein named to the offices of Shell-fish Commissioners therein under-

taken to be established, and that chap. 18, Public Laws of 1899, is void in so far as it undertakes to repeal that part of chap. 13, Public Laws of 1897, which created the office of Chief Inspector of Shell-fish, to which office plaintiff was duly appointed.

The Court is of opinion that the plaintiff is entitled to receive salary and expenses as provided under chap. 13, Laws 1897, unless payment of the same has been prohibited by chap. 21, Public Laws 1899, which directs that the State Treasurer shall not pay any compensation for services rendered concerning the shell-fish industry unless such persons are authorized to render such services under the provisions of chap. 19, Laws 1899.

It is manifest that the General Assembly, by enacting said chap. 21, did not intend that the Chief Inspector should perform the duties of his office without compensation therefor.

It is equally manifest that said chapter was enacted upon —and would not have been enacted but for—the assumption that by chap. 18 the office of Chief Inspector had been abolished, and that by chap. 19 the persons named therein had been appointed to the offices of Shell-fish Commissioners.

The Court is therefore of opinion that said chap. 21 is dependent upon and falls with those parts of chaps. 18 and 19 which have been held to be void.

It further appears that said chap. 19, Laws 1899, which provided for the appointment of seven persons as Shell-fish Commissioners, further provides that "each of the said Commissioners shall receive as compensation the sum of $400 per annum."

It is manifest that by said provision the General Assembly did not intend to increase the salary of the Chief Inspector to $2,800 or to diminish it to $400, but to provide compensation for the seven Commissioners undertaken to be appointed.

The Court is of opinion that said provision as to compensation can not be construed as amendatory to chap. 13, Laws of 1897, but is dependent upon and falls with the void provision as to the appointment of Shell-fish Commissioners.

It is hereupon adjudged that plaintiff is entitled to receive a salary of $75 per month and actual travelling expenses, as provided under chap. 13, Public Laws of 1897, from March 15, 1899, up to the present time; and it is further ordered and adjudged that a mandamus issue directed to H. W. Ayer, the State Auditor, commanding him to issue a warrant for the amount due the plaintiff under chap. 13, Public Laws of 1897; and that a mandamus issue directed to W. H. Worth, State Treasurer, commanding him to pay to plaintiff said amount.                                                  H. R. STARBUCK,

*Judge Presiding First Judicial District.*

To the foregoing judgment the defendant excepted. Exception overruled. Appeal prayed by defendants. Notice waived. Appeal bond adjudged unnecessary. The controversy without action and the judgment to constitute the case on appeal.

J. C. L. HARRIS,
*Attorney for Plaintiff.*
F. H. BUSBEE,
*Attorney for Defendants.*

December 4, 1899.

*Messrs. F. H. Busbee,* and *Cook & Green,* for appellants.
*Mr. J. C. L. Harris,* for appellee.

FURCHES, J.  This is a controvery without action under secs. 567 and 568, of The Code. The facts agreed, upon which the judgment of the Court is asked, are as follows:

The General Assembly of North Carolina, in 1897, passed an act to provide for and promote the oyster industry of North Carolina, ratified February 23, 1897, being chap. 13, of the Laws of 1897. This act is made a part of the case.

That on the 23d day of February, 1897, the plaintiff was duly appointed by the Governor of North Carolina, under the provisions of said act, Chief Inspector for the constitutional term of four years, and was duly commissioned as such, and was inducted into said office and proceeded to discharge the duties thereof. The compensation to be received by him was as provided in sec. 13 of the act.

The General Assembly of North Carolina, in 1899, passed an act to provide for the general supervision of the shell-fish industry of the State, ratified March 2, 1899, being chap. 19, of the Laws of 1899. Under this act, the persons named in sec. two (2), namely: George H. Hill, of Washington, Beaufort County; B. D. Scarboro, of Avon, Dare County; Daniel L. Roberts, of New Bern, Craven County; Robert W. Wallace, of Beaufort, Carteret County; C. C. Allen, of Elizabeth City, Pasquotank County; J. M. Clayton, of Englehard, Hyde County, and Daniel B. Hooker, of Bayboro, Pamlico County, undertook to discharge the duties of Shell-fish Commissioners, under the claim that the Act of 1897 was repealed by the Act of 1899.

That the persons named in the preceding paragraph, having undertaken, under the title of Shell-fish Commissioners, to discharge the duties devolving upon the plaintiff as Chief Inspector, and having taken possession of the Steamer Lilly, the plaintiff brought suit in the county of Pamlico against said persons to try the title to the office. The record in said case, together with the opinion of the Supreme Court of North Carolina, adjudging that the title of the plaintiff was a valid one, is made a part of this case.

That since the 15th day of March, 1899, up to November 20, 1899, the defendant H. W. Ayer, Auditor of the State, has refused to issue to the plaintiff a warrant for the sum of $75 per month and his actual travelling expenses, and has also refused to issue warrants to the deputy inspectors appointed by the plaintiff in accordance with the Act of 1897; and the defendant W. H. Worth, State Treasurer, for the same period of time, has refused to pay the salary and travelling expenses of the plaintiff as Chief Inspector, and also the $50 per month claimed by the deputy inspectors.

That since the opinion of the Supreme Court has been filed the plaintiff has again demanded of the Auditor the issuance of a warrant in his favor for the amount of his salary and expenses, and the same has been refused by the defendants. The defendants base their refusal upon the Acts of 1899, chap. 21, which is made a part of this controversy.

The plaintiff insists that by the decision of the Supreme Court, hereinbefore mentioned in the facts agreed, he is entitled to a salary of $75 a month and actual travelling expenses from the time of the last payment made to him up to the present time, and that this is not prohibited by chap. 21, Acts of 1899, above mentioned. He asks that a mandamus issue to the defendant, the State Auditor, requiring him to issue a warrant for the amount due him under the law, and also that a mandamus issue, directed to the State Treasurer, requiring and compelling him to pay the same, and for all further relief which, under the facts above mentioned and the law of North Carolina, he is entitled to.

It is further agreed that no part of the compensation as provided in chap. 19, Public Laws 1899, has been paid to the persons therein named as Shell-fish Commissioners, and that the State Treasurer has on hand of the oyster fund collected under the provisions of chap. 13, Laws 1897, and chap.

19, Laws 1899, an amount sufficient and available for the payment of such salary and travelling expenses as the plaintiff may be entitled to.

Upon these facts the plaintiff contends that he is entitled to a writ of mandamus against the defendants. This contention is disputed by the defendants, and the plaintiff's right to a mandamus is denied.

It has been decided by this Court that the plaintiff is entitled to hold his office of Chief Inspector, to which he was appointed in 1897, for the remainder of his term of four years. *White v. Hill,* 125 N. C., 194. This is settled, and the question is now presented as to whether or not he shall have pay for his services.

The plaintiff was duly appointed and inducted into his said office in March, 1897, for a term of four years, under an Act of the Legislature ratified on the 23d day of February, 1897—being chap. 13, of the Public Laws of that year. Under this act he was entitled to a salary of $75 per month, or $900 per annum, payable monthly. This is not denied by the defendants, but they say that chaps. 18, 19 and 21, of the Public Laws of 1899, had the effect to destroy the plaintiff's right to pay. They say that chap. 18 repeals sec. 13, of the Act of 1897, and this is true; and they say that chap. 21 prohibits them from paying a salary to anyone not acting under chap. 19, of said act; and it is true that this act so provides. And the defendants say that the plaintiff is not acting under the act, chap. 19, and is not entitled to any pay for his services. But, as it is seen that the plaintiff's office to which he was appointed in 1897, still exists, and that he is entitled to hold the same and perform its duties, it would seem that he is entitled to receive the salary attached thereto. *Dalby v. Hancock,* 125 N. C., 325; *Gattis v. Griffin, Ib.,* 332.

The Legislature may abolish a legislative office, and this is the end of it. *White v. Hill, supra; Hoke v. Henderson,* 15 N. C., 1. When the office is abolished, this ends the term of the officer holding it, as there can be no officer without an office, and of course no salary without an officer.

The Legislature may reduce the salary of an existing legislative office, if this is done for the benefit of the public, and not for the purpose of injuring the incumbent and to starve him out. But if it clearly appears that it was done for that purpose, it would be void. *Bunting v. Gales,* 77 N. C., 283; *Hoke v. Henderson, supra.* In cases where only a part of the salary is taken from the officer, it would have to appear from the legislation itself that the object was unlawful, or the courts would not interfere. *Hoke v. Henderson, supra.*

But if the Legislature should undertake to deprive the officer of the whole of his salary, while his office still continued, the intent would so plainly appear that the act would be declared void. *Hoke v. Henderson, supra; Cotten v. Ellis,* 52 N. C., 545.

The plaintiff holds his office under an appointment made in 1897, but he holds and discharges the duties of his office under such laws as may be passed, and in force, during his term of office.

The Legislature on the 28th day of February, 1899, passed an act expressly amendatory of chap. 13, Laws 1897—this being the act under which the plaintiff was appointed. And on the 2nd day of March, two days thereafter, it passed another act upon the subject of oysters and shell-fish. This act does not state that it is an amendment of the former acts, nor does it purport to repeal the previous legislation on the subject of oysters and shell-fish, except so far as they are in conflict with the act of the 2nd of March, 1899. And on the 8th of March, 1899, it passed chap. 21, which is stated to be

"supplemental to chap. 19, passed on the 2nd of March."
This last act prohibits the Treasurer from paying any com-
pensation claimed for services, unless the person so claiming
them, shall be authorized to render such services under chap.
19, of which act this act is a supplement.

The Legislature having general powers of legislation, all
these acts must be observed and enforced, unless they con-
flict with the vested constitutional rights of the plaintiff.
(We say the constitutional rights of the plaintiff, for the
reason that his rights alone are before us for our considera-
tion.)

It is then the duty of the plaintiff to administer his office
under the law as it now exists; that is, under the Act of 1897,
as modified and changed by the Legislature of 1899, chap.
18, and chap. 19, of the Public Laws of 1899.

For the purposes of this action it is not necessary for us to
decide whether chaps. 18 and 19, Laws 1899, were intended
as amendments of the Act of 1897 or not. They are both a
part of the Public Laws of the State, and must be observed
when not in conflict with the plaintiff's vested rights. Chap.
18 is expressly stated to be an amendment to the Act of 1897;
and chap. 19 does not state whether it is an amendment or
not. But both acts are on the same subject, and must be
considered together and treated as amendments. And where
they expressly repeal the former act or are in conflict with its
provisions, the provisions of the latter act must prevail, unless
they are in conflict with vested rights. It is so held in
*White v. Hill, supra,* which is expressly put on *Abbott v.
Beddingfield,* 125 N. C., 256, and *McCall v. Webb, Ibid,*
243. And as the plaintiff is not only authorized to perform
the duties required by chap. 19, but it is in fact his duty to do
so, there can be no reason for applying the provisions of chap.

21; and it is not necessary for us to decide whether it would be valid or not, if it were necessary for us to decide that question.

The fact that the Legislature of 1899 changed the name of "an act to promote the oyster industry of North Carolina" to that of "Shell-fish Commissioners," did not abolish the plaintiff's office. *While v. Hill,* and *Abbott v. Beddingfield, supra; Wood v. Bellamy,* 120 N. C., 212. Nor does the fact that the Act of 1899 changed the name of the plaintiff's office from that of "Chief Inspector" to that of "Chairman of the Shell-fish Commission," oust the plaintiff from his office or deprive him of his salary. *Wood v. Bellamy,* and *Abbott v. Beddingfield, supra.*

The plaintiff being entitled to his office and to the salary attached thereto, what is his salary under the legislation as it now exists, and how is he to get it?

Under chap. 19, of the Act of 1899, it seems to us that it has been reduced to $400 per annum and five cents per mile travel, when engaged in his work, and extra expenses not to exceed $50 per annum. We can not say that this reduction was not made for the public benefit, and we have no power to change it, and no disposition to do so if we had. The reduction may be made. *Gales v. Bunting,* and *Hoke v. Henderson, supra; White v. Murray,* at this term.

Then what is necessary to be done to enable the plaintiff to draw his salary? The Act of 1897 did not give specific directions as to this. The Act of 1899, chap. 19, sec. 9, provides that this shall be done upon the warrant of the Auditor, "which warrant shall be issued by the Auditor upon the certificate of the Secretary of said Board, and countersigned by the Chairman of the Shell-fish Commission." This was only a matter of detail, which seems to have been proper to supply a defect in the Act of 1897, and was passed when it was

thought that Hill and his force would be in office. And we can not, and do not construe this paragraph to mean that the incumbent should not receive any salary for his services. This, in our opinion, would be to construe the act to mean what we think the Legislature could not do; *Cotten v. Ellis, supra;* and it would also be to construe it to mean what it does not say, and what we do not think the Legislature intended it to mean.

So, if this direction as to the manner of issuing the warrant can not be literally complied with—*in hic verbis*—it should be complied with "as near as may be." That is, the certificate should be issued by the clerk of the present board and countersigned by the plaintiff who is acting as chairman, in place of Hill, and the Auditor's warrant should issue upon this certificate.

This opinion might close here, and would do so, but for the arguments urged in opposition to the views we have expressed, some of which it seems to us should be noticed.

It is said that chap. 19 names certain persons as commissioners, and that the plaintiff is not one of those named in the act. This is true. But the act does not provide that the salary shall be paid to these parties, *eo nomine,* but to the commissioners performing the duties prescribed by the act. Suppose any or all of the commissioners named in chap. 19 had died or resigned, is it contended that still they should receive the salary, or that the work should stop and the commission fall through and fail on that account? They are out, and so far as we know, are not claiming any pay.

It was said this Court had no jurisdiction of this matter, that it only has appellate jurisdiction, that the assumption of such jurisdiction is unheard of; that the judgment of the Court will be *ultra vires,* unlawful, unconstitutional and void, and that the *Legislature* may declare it unconstitutional; and

if it should do so, and the Treasurer should obey the judgment of this Court, he might be in danger. This argument seems to proceed upon the idea that this proceeding was commenced in this Court, whereas the record shows that it is here on appeal from the Superior Court of Pasquotank County. And it would seem that the slightest examination would have shown that it is not a proceeding unheard of before.

In *Marbury v. Madison,* 1 Cranch, 49, which was mandamus against James Madison,Secretary of the United States, it was held that the action would lie.

In *Cotten v. Ellis,* 52 N. C., 545, which was a proceeding in mandamus by Cotten, claiming a *salary* as Adjutant General of North Carolina, against John W. Ellis, Governor of North Carolina, it was held that the action would lie, and the writ was issued.

But a more recent case is that of *Granville County Board of Education v. State Board of Education,* 106 N. C., 81, in which it was held that the action would lie, and the writ was granted. The opinion of the Court in that case was written by Justice CLARK, and seems to be a direct authority for issuing the writ in this case.

The opinion in *Cotten v. Ellis, supra,* is not only authority for granting the writ, but it would be well to note what the Court says, near the close of the opinion, with regard to the execution of the writ, which is in these words: "We do not enter upon the inquiry as to how the writ will be enforced, because we are not allowed to suppose that the question will arise, feeling assured that the sole purpose of the Governor is to obtain a judicial construction of the statute in question." The opinion (*Cotten v. Ellis*) also contains this language: "A statute which *reduces* a salary during the term of office, and one which *takes away the salary altogether,*

stand on different footings, for in the latter case, the object would evidently be to starve the incumbent out of his office, and thereby do indirectly what could not be done directly, so as to make applicable the remarks made in the case of *Hoke v. Henderson,* in which there seems to be much force, that such indirect legislation is as obnoxious to the charge of being unconstitutional as an act directly depriving one of his office. A proper construction of the statute does not lead to the inference that it was the intention to abolish the salary, in the event that the applicant still continued entitled to the office and liable for the discharge of its duties.  On the contrary, the clause which repeals so much of the 9th section as relates to the salary is a mere corrollary or incident to the clause which repeals so much of that section as relates to the appointment of the Adjutant General, and consequently the one can not, by any rule of construction, be made to extend in its operation further than the other."  To hold otherwise, the Court says, "would be to place the Legislature in this attitude —we mean to abolish the office; if we have not the power to do so, then we mean to deprive the present incumbent of his office; if we have not the power to do that, then we mean to take away his salary."

The facts in *Cotten v. Ellis* are so nearly the same as the facts in this case, is our excuse for quoting so much of the opinion.

Before the suggestion that the *Legislature may declare the opinion of this Court unconstitutional* may be adopted by anyone, we ask them to read the opinion of Chief Justice Marshall in the case of *Marbury v. Madison, supra.*  It is a full and complete answer to this suggestion.  We would like to incorporate the whole of that opinion in the opinion of the Court in this case; but as this is impossible, we will again have to ask to be pardoned for making some quotations from

this very able opinion, emanating from the mind of probably the greatest jurist this country has produced. It fully sustains the doctrine of *Hoke v. Henderson*, 15 N. C., 1, that an office is property—a vested right—of which he can not be deprived. It discusses the relation of the government to the citizen, the supremacy of the Constitution over ordinary legislative acts, the relation of the executive, legislative and judicial departments of the Government, and shows that all three of these departments are equally bound by the Constitution, but within their own departments; that while it is the exclusive right of the legislative department to enact laws and the duty of the executive to enforce them, it is the exclusive right of the judiciary to construe them, and to say whether they are repugnant to the Constitution or not. The idea that the executive or the legislative department has any right to put a different construction on a statute or a different construction on the Constitution than the court has, is utterly repudiated. On page 59 (1 Cranch), it is said: "The Government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of vested legal rights." And on page 61, it is said: "But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured has a right to resort to the law of his country for a remedy."

On page 62:   "The question whether a right has vested or not is in its nature judicial and must be tried by the judicial authority."

On page 64:   "What is there in the exalted station of the officer, which shall bar a citizen from asserting in a court of justice his legal rights, or shall forbid a court to listen to the

WHITE *v.* AUDITOR.

claim, or to issue a mandamus directing the performance of a duty, not depending on executive discretion, but upon particular acts of Congress and the general principles of law?"

On page 66: "The doctrine therefore now advanced is *by no means a novel one.*"

On page 67: "If Congress remains at liberty to give this Court appellate jurisdiction, when the Constitution has declared their jurisdiction shall be original, and original jurisdiction when the Constitution has declared it shall be appellate, the distribution of jurisdiction made in the Constitution is form without substance."

On page 69: "The Constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts is alterable when the Legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the Constitution is no law; if the latter part be true, then written constitutions are absurd attempts on the part of the people to limit a power in its own nature illimitable. * * * If an act of the Legislature, repugnant to the Constitution, is void, does it, notwithstanding its invalidity, bind the Court and oblige them to give it effect? Or in other words, though it be no law, does it constitute a rule as operative as if it was a law?"

On page 70: "It is *emphatically the province and duty of the judiciary to say what the law is* (the italics are ours). * * * So, if a law be in opposition to the Constitution, if both the law and the Constitution apply to a particular case, so that the Court must either decide the case conformably to the law, disregarding the Constitution, or conformably to the Constitution, disregarding the law, the Court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty."

We can not quote all of this very able and exhaustive opinion, but we trust that we have quoted sufficiently from it to establish the separate independent jurisdiction and power of courts to decide the law, and to show that neither the executive nor the legislative department has any such power.

Our opinion then is, that the plaintiff is entitled to the salary and compensation provided for in the Act of 1899, chap. 19 (and the same that Hill would have been entitled to if he had remained in office), to be paid by the Treasurer of the State, out of the oyster fund appropriated by the Act of 1897 and the Act of 1899, admitted to be now in his hands: *Provided,* that the expenses of this commission do not exceed the sum of $6,000 per annum, and that the certificate and warrant shall be issued in the manner we have indicated.

This action is to recover the *salary of a public officer.* The facts are agreed, and from these facts it appears that there is now money in the hands of the Treasurer, more than sufficient to pay the plaintiff, which arose from the oyster fund, under the Acts of 1897 and 1899. That this fund is specially appropriated to the payment of the salaries of officers serving under the Act of 1899; that the Auditor and Treasurer are *honest men, and faithful public officers,* and want to do their duty. They wanted the opinion of the Court as to what that was, and neither of them nor their counsel made any objection to both being defendants; but it is made, and it would seem that the party making it can see no difference between the *salary of a public officer* and a *claim* against the State; nor can he see the distinction between *Garner v. Worth* and *Cotten v. Ellis.*

The judgment of the Court below will be modified in conformity with this opinion, and being so reformed, judgment will be entered in this Court.

Modified and affirmed.

DOUGLAS, J., concurring. I shall be glad indeed when all the office-holding cases are finally decided, not only from their intrinsic difficulty, but more so from the vast amount of discussion to which they have given rise. Much of this discussion, viewed from my standpoint, has seemed irrelevant and indeed liable to mislead. Hence upon one or two occasions I have felt compelled to explain myself in a concurring opinion, as I did not wish to be misunderstood upon important constitutional questions. My personal views are fully set out in *Wilson v. Jordan*, 124 N. C., 707, and *Green v. Owen*, 125 N. C., 212.

I have given this case most careful consideration, especially in view of the division of opinion, and I see no reason to overrule the unanimous opinion of this Court as expressed in *Wood v. Bellamy*, 120 N. C., 212. If I follow that opinion to its necessary and legitimate results, I am forced to concur with the Court in the case at bar. In fact, the case as now before us presents no substantial difficulties to my mind. Whatever complications may have existed were solved when we decided that the plaintiff was entitled to the office. The only question now before us is whether he shall receive the compensation which the Legislature attached to the performance of its duties. We are not creating any office, for the office was admittedly created by the Act of 1897, and it does not appear to us that it was abolished by the Act of 1899. We are not affixing any salary to the office further than that we find expressly provided in the Act of 1899—the last expression of legislative will. We are not levying any public taxes, nor appropriating any public money. This was done to the fullest necessary extent by both acts. That of 1897 raised and appropriated to the specific purposes of this case an ample fund, much of which still remains in the treasury unexpended and not otherwise appropriated. The case comes

before us on facts agreed, and it is expressly stated that "the State Treasurer has on hand of the oyster fund collected under the provisions of chap. 13, Laws 1897, and chap. 19, Laws 1899, an amount sufficient and available for the payment of such salary and travelling expenses as the plaintiff may be entitled to." No one else is now claiming it, and no one else is now performing the duties which would entitle him to receive it.

The only reason given why it should not be paid to the plaintiff is a construction of sec. 1, chap. 21, Laws 1899, which it seems to me would ascribe to the Legislature most unworthy motives. This section provides that "the Treasurer of the State of North Carolina shall not pay any compensation to any person or persons claiming the same for services rendered concerning the shell-fish industry, unless such person or persons are authorized to render such services under the provisions of the said act." (Chap. 19, Laws 1899.)

We are asked who were authorized to render such services under said act? Plainly the person or persons rightfully performing the official duties prescribed by that act. Can we say that the primary object of the Legislature was not the public welfare, but the private benefit of the individuals named in the act? Have we any right to say that the Legislature, in providing for the protection and supervision of one of the great industries of the State, intended to say to the Treasurer, "We think that the proper supervision of the shell-fish industry is necessary for the public welfare, and for this purpose we have appropriated the public money, but if that public money can not go into the pockets of our personal friends whom we have named in the bill, we prefer that those important public duties should remain unperformed and those great public interests entirely neglected." The Legislature has not said so; it could not legally say so, and it shall not

be made to say so, even inferentially by any construction of mine.    It is my duty as well as my pleasure to place upon its acts a construction in harmony with the public interests which they are bound to protect, and the Constitution which they are sworn to obey.    They may well have believed that the office held by the plaintiff had been legally abolished, and that they had the right to fill the offices they had presumably created.    So believing, they may have intended simply to instruct the Treasurer not to pay any mere claimant under any other act, but if he could not pay their appointees, to hold the fund until it was legally determined to whom it should be paid.    Such would have been their legal intent, and such I prefer to believe was their actual intention.

Of course I would deeply regret to see my native State visited by earthquakes or cyclones of a civil or material nature, and I am glad to say they have no germ in the decision we are rendering.    This case is a small one, actually and potentially.    It enunciates no new principle, and involves but little money.    Construing the two acts together, we find an office created by the Legislature with a salary attached thereto and a fund specifically appropriated for the payment thereof.    All we now say is that the man legally and rightfully performing the duties of the office is entitled to the compensation thereunto affixed by law.

MONTGOMERY, J., dissenting.    Because of the great public importance of the matters involved in the discussion and decision of this case, I have given to it a more thorough consideration than a Judge of this Court usually gives, or has time to give to the investigation of cases generally, and, after all, I find myself unable to agree to the conclusion reached by a majority of the Court that the plaintiff is entitled to writs of mandamus against the Auditor and Treasurer to

enforce the collection of his claim.   It has been decided in *White v. Hill,* 125 N. C., 194, that the plaintiff is entitled to his office.   I therefore agree in the present case with the Court that he is entitled to his salary, whatever that may be. I think he is entitled to the whole amount named in the Act of 1897, ($75 per month), and his necessary travelling expenses.   While the salary is no part of the office, but only an incident thereto, it is yet the consideration for which the services and duties of the office are performed, and the salary therefore must follow the office.   I am of this opinion because I regard the decision in *White v. Hill, supra,* as determining that that part of the Act of 1899, which undertook to create a Board of Commissioners and to distribute amongst them the duties of the plaintiff as Chief Inspector, was unconstitutional, and therefore no such board being .in existence, the plaintiff can not be their Chairman and entitled to a salary of $400, allowed by the Act of 1899, to such · Chairman.   He is still, however, the chief officer, by whatever name to be called, of the Oyster or Shell-fish Industry, and is to discharge the duties of that position as best he may under the provisions of the Act of 1899.

I further agree with the Court that the legislative department of our State Government is not the supreme—sovereign power in the State.   I also agree with the Court that any public officer who is required by law to perform a specific duty, which concerns individual rights dependent upon the performance of that duty, may be compelled to perform that duty at the suit of a person who alleges that he is injured; and I agree with the Court that, when any Act of the General Assembly is plainly contrary to the provisions of the Constitution, such act is void, and it is the right and the duty of the Supreme Court to so declare it.

The only point of difference then between my views and the

opinion of the Court is this: The Court construes the Act of 1899 in reference to the shell-fish industry to mean that the funds now in the hands of the Treasurer, derived from that industry, are not only appropriated specifically by law to the payment of the expenses of carrying out that law, but that as the plaintiff has been declared by this Court to be entitled to his office acquired under the Act of 1897, he is therefore performing services under the Act of 1899, and is therefore entitled in law to have his writs of mandamus against the Auditor and Treasurer to have enforced the payment of his salary; that the plaintiff is entitled to this remedy, notwithstanding the Act of 1899 specifies a method by which the money is to be drawn from the treasury, and it is apparent that that method can not be followed. The contention last mentioned I can not agree to, however much force there may be in the former, under the decision in *Day's Case,* 124 N. C., 362.

The method by which the oyster funds are to be drawn out of the Treasurer's hands is set out in sec. 9, of chap. 19, of the Acts of 1899. The Auditor's warrants are required to be issued upon the certificate of the Secretary of the Board of Commissioners of the Shell-fish Industry, and countersigned by the Chairman of the Board. That method can not be complied with, for under the decision in *White v. Hill, supra,* there is no Chairman or Secretary of such a Board. Any other method of drawing this money out of the Treasurer's hands, in my opinion, would be one arbitrarily prescribed by the Treasurer, or one authorized by judicial construction purely; and while I think, as I have said, that the plaintiff is entitled to his salary, yet I can not get my consent as a member of this Court to join in an order to the Treasurer, for the reason that the method by which the same may be paid can not be carried out.

It is true that the Legislature, in appointing the method by which this money might be paid out by the Treasurer, has been disappointed in that those officers, whose duty it was to certify to the Auditor the persons and the amounts to be paid, have been declared by the Supreme Court to have had and to have no existence; yet, I do not think that by judicial construction another method may be substituted.

If the General Assembly, when it enacted sec. 9, of chap. 19, of the Laws of 1899, in place of sec. 13, of chap. 13, of the Acts of 1897, had provided that warrants issued by the Auditor for the payment of claims against the oyster fund should be certified by a committee, the persons composing that committee being dead, and the Legislature not being aware of that fact, or by a committee who might die while charged with the duty of certifying the claims, the method would fail by reason of the non-existence of the certifying committee, but neither the courts nor the Treasurer could adopt another method for the payment of the claims than the one prescribed by the General Assembly. Another method would have to be adopted by the Legislature and the claimant would have to wait until that was done.

This is not a case where the officer is left to discharge his duties and at the same time be deprived of his entire salary, in so many words, by the legislative enactment. In such a case, the attempt to deprive the officer of his entire salary—to starve him out—and still require him to discharge the duties of the office, would be void under the decision in *Hoke v. Henderson.* But this is a case where the General Assembly considered that they had abolished the office, and it is only by judicial construction that the abolition of the office was not effected; and while under the judicial decision the old officer retains his position, and while the oyster fund in the hands of the Treasurer is appropriated to the payment of

claims against that fund, yet the essential prerequisites to the drawing out of that fund can not be complied with, for the reasons that I have given above.

It has been said, not by counsel in the case, however, that if this Court is powerless to compel the payment of a salary due to a public officer, then the decisions of this Court that an office is property are of no avail, since the Legislature hereafter in removing legislative officeholders could simply declare that such displaced officers should not receive compensation for their services. That, in my opinion, is not a true proposition of law, and that any General Assembly of North Carolina should pursue such a course is unthinkable to me. If an officer should have his office taken from him by legislative enactment before his term expires, and the duties of his office are continued, the courts can declare such an Act of the Legislature void. If an appropriation has been made by the General Assembly for the payment of a salary of such an officer, and no particular method has been prescribed by which it is to be paid, the Auditor can issue his warrant to the claimant, and the Treasurer must pay it. If a particular method has been prescribed, that method must be followed. If an office is continued and the officer is required to perform the duties thereof, and the General Assembly should fail or refuse to make an appropriation for the payment of his salary, that would present a case indeed where the courts could not compel the legislative branch of the Government to perform a plain duty. If such an abuse of power were possible, the courts could give no relief; the people themselves would have to correct it.

In *Hoke v. Henderson*, the Court said: "The Constitution of this State provides that the Governor, Judges, Attorney-General, Treasurer, and other officers shall be elected, and that certain of them shall have adequate salaries during

their continuance in office.   Suppose the Legislature (at that time the elective body) should refuse to elect those officers, or to give them salaries, or after assigning them salaries in a statute, should refuse to lay taxes or to collect a revenue to pay them; all these would be plain breaches of constitutional duty.   And yet a court could give no remedy, but it must be left to the action of the citizens at large to change unfaithful for more faithful representatives.   Yet no one will say that the Legislature can, by law, remove the Governor, or a Judge, or any other head of a department, because they can unconstitutionally refuse to provide salaries for them, and the courts can not compel the raising of such salaries.   Nor can it be said because there can not be such compulsion, that therefore the law is constitutional."   That quotation is certainly an answer to such a suggestion, and it must be that unless our system of government is an absolute failure, no body of men could ever get or hold power who would resort to such a device to defraud men of their property rights in the offices they hold.   The Legislature of North Carolina has undertaken to abolish offices, and, as a result, salaries have been thought to be destroyed; but that body has never undertaken to continue the office and at the same time to deprive the officer of his compensation, and I believe never will.

This, it is to be hoped, is the last of the cases which involve the title to public office.   The first one was *Wood v. Bellamy,* 120 N. C., 212.   There, it was held by a unanimous Court that in North Carolina a public office is property belonging to the officeholder by contract between the State and himself, as had been held in *Hoke v. Henderson,* 15 N. C., 1. That unanimity of opinion continued up to and during the September Term, 1897, of this Court, when the case of *Ward v. Elizabeth City,* 121 N. C., 1, was decided.   The opinion in that case was written by Justice CLARK, who, after stating

the proposition that the Legislature could not turn an officer out by an act purporting to abolish the office, but which in effect continues the same office, said: "This is on the ground that an office is a contract between the officer and the State, as was held in *Hoke v. Henderson,* 15 N. C., 1, and has ever since been followed in North Carolina, down to and including *Wood v. Bellamy,* though this State is the only one of the forty-five States of the Union which sustains that doctrine."

Since the decision last mentioned, Justice CLARK has entered numerous dissenting opinions (which are part of the history of this Court), notably in the case of *State Prison v. Day,* 124 N. C., 362; *Wilson v. Jordan, Ibid,* 683; *Gattis v. Griffin,* 125 N. C., 336, and *Abbott v. Beddingfield, Ibid,* 256, in which he has with marked ability attacked the doctrine so long and so firmly established in the decisions of this Court that an office is property, and that it exists by contract between the State and the officeholder.

It has been suggested that the legislative department of the Government may resent the opinion of the Court in this case and pronounce it extra-constitutional itself. I feel satisfied, however, that the General Assembly will follow the course which has characterized that body since the foundation of the Government, that is, respect the authority and decisions of the highest court in the State as the final determination upon any matter of law or legal inference that may be before it under its appellate jurisdiction. In 1787, the highest court in the State in *Bayard v. Singleton,* 1 N. C., 42, where an act of the General Assembly alleged to be unconstitutional was before it for the decision of that question, said: "But that it was clear that no act they (the Legislature) could pass could by any means repeal or alter the Constitution, because, if they could do this, they would at the same

38——126

instant of time destroy their own existence as a Legislature, and dissolve the Government thereby established. Consequently the Constitution (which the judicial power was bound to take notice of as much as any law whatever) standing in full force as the fundamental law of the land, notwithstanding the act on which the present motion was grounded, the same act must of course, in that instance, stand as abrogated and without any effect." And since that time this Court has continued in proper cases to decide acts of the General Assembly to be unconstitutional.

In *Marbury v. Madison,* 5 U. S., 49 (1803), where an Act of Congress, alleged to be unconstitutional, was before the Supreme Court of the United States, the Court took jurisdiction, and decided against the constitutionality of the act, and that decision has been followed in proper cases by that Court to this day. The opinion of the Court in that case is so opposed to the view of the sovereignty of the legislative branch of the Government, that it may be well to quote from it at some length. It is there said, Judge MARSHALL delivering the opinion of the Court: "The Constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the Legislature shall please to alter it. If the former part of the alternative be true, then the legislative act contrary to the Constitution is not law; if the latter part be true, then written Constitutions are absurd attempts on the part of the people to limit a power in its own nature illimitable. Certainly all those who have framed written constitutions contemplated them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be that an Act of the Legislature repugnant to the Constitution is void. If an Act of the Legislature repugnant to the Constitution is void, does

it, notwithstanding its invalidity, bind the courts and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law? This would be to overthrow in fact what was established in theory, and would seem at first view an absurdity too gross to be insisted on. It shall, however, receive a more attentive consideration. It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each. So, if a law be in opposition to the Constitution, if both the law and the Constitution apply to a particular case so that the Court must either decide that case conformably to the law, disregarding the Constitution; or conformably to the Constitution, disregarding the law, the Court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty."

The Court has not undertaken to decide that the Treasurer of North Carolina can be made to pay out money in a case where no appropriation by the General Assembly has been made. There is not a member of the Court who would think of doing such a thing. The decision of the Court rests upon the foundation and proposition that the General Assembly has appropriated a particular fund for the payment of the plaintiff's claim. There can therefore be no clash between the two departments of government. Nobody would dispute the proposition that if this fund had been appropriated by the General Assembly to the payment of the plaintiff's claim, the Treasurer could be made by mandamus to pay it. The duty required of the Treasurer would involve no judicial discretion, and would be simply a ministerial duty. *County Board of Education v. State Board of Education,* 106 N. C., 81.

In the last-mentioned case, *Marbury v. Madison, supra,* is cited as authority. Upon examination of that case upon that point, the facts are that Marbury was appointed by the President of the United States (John Adams), a Justice of the Peace for the county of Washington in the District of Columbia. The commission had been signed by the President and the seal of the United States affixed thereto, but it had not been delivered when Mr. Jefferson entered upon his duties as President. Mr. Madison, the new Secretary of State, refused to deliver the commission to Marbury, whereupon Marbury moved in the Supreme Court of the United States for a rule to James Madison, Secretary of State, to show cause why a mandamus should not issue commanding him to be caused to deliver to him his commission. The Court held that it was a plain case of a mandamus either to deliver the commission or a copy from the record. But the rule was discharged, not because mandamus was not the proper remedy, but because the Supreme Court was a Court of appellate jurisdiction, and did not have the jurisdiction to hear the motion as an original proceeding in that Court.

CLARK, J., dissenting. The General Assembly of 1899, by chap. 21, ratified March 8, 1899, enacted: "Section 1. The Treasurer of the State of North Carolina shall not pay any compensation to any person or persons claiming the same for services rendered concerning the shell-fish industry, unless such person or persons are authorized to render such services under the provisions of the said act, entitled 'to provide for the general supervision of the shell-fish industry of the State of North Carolina,' and ratified March second, eighteen hundred and ninety-nine." Who are authorized to render such services *"under the provisions* of the said act?" Plainly we must turn to the provisions of said act, which is chap. 19. We find it there provided: "Section 1. There shall be seven

·commissioners, hereinafter named in this act, to carry out the provisions of this act," and sec. 2 names the seven commissioners, and it is provided "that if anyone of those named shall die or resign, those remaining shall fill the vacancy." There can be no possibility of doubt who are authorized "under the provisions of the said act." They are named in the act, and the Treasurer is forbidden to pay anyone else. The plaintiff is not one of them.

Can the Court order the Treasurer to pay him when the Legislature has ordered the Treasurer not to pay him?

The identical point has been expressly decided against the plaintiff by this Court in cases on "all fours" with the one before us. In *Boner v. Adams,* 65 N. C., 639, the Court says that a mandamus can not be brought against the Auditor and Treasurer at the same time (as is here attempted) because in no case could a mandamus lie against the Treasurer until a warrant had been issued by the Auditor. READE, J., then says as to the Auditor, that he is "not a mere ministerial officer," because *he* is to judge whether there is "sufficient provision of law for its payment." He adds: *"The most* this Court could do would be to order the Auditor to examine the claim and to allow it, if *he* thought it correct, and in that event to issue his warrant for it, if *in his opinion* there is sufficient provision of law for its payment." The Court then says: "Nor can we pass upon the merits of the claim."

In *Bayne v. Jenkins,* 66 N. C., 356, we have a duplicate of the present case (if an office is a contract). There L. P. Bayne & Co. had a contract with the State, and, as in the present case, the Legislature directed that no payment should be made under it. The Court held that a mandamus could not issue for payment of plaintiff, and said: "The Auditor in his warrant upon the Treasurer, in any case, must recite the law under which it was issued, and as the Legislature has

expressly forbid a warrant or the payment of money in this case, the Auditor could not issue a warrant.   *   *   *   If the plaintiff have a claim as alleged, it seems that his remedy is an application to the Legislature or a suit originated in this Court," (which could only recommend payment to the Legislature.   Constitution, Art. IV, sec. 9.)   If the plaintiff's claim that his office is a contract be conceded, then these cases are precisely alike, differing only in the name of the plaintiff.   It is passing strange if the Constitution permitted any Superior Court Judge to issue a mandamus to the public Treasurer to pay a claim against the State when it expressly forbids the Supreme Court in a case begun there, to do more than recommend payment to the Legislature.   The original jurisdiction of claims against the State is given by the Constitution to the Supreme Court alone.

As is well said in the brief of Mr. K. P. Battle in the latter case, "If each Superior Court in the State could order the Treasurer to pay out moneys or command the Auditor to issue warrants, the fiscal concerns of the State could not be regulated or intelligently conducted.   All claimants could *in effect sue a sovereign State* by resorting to *mandamus* against the officers in charge of her funds."

These cases have ever since been held as authority and have never been questioned in any way.   In *Koonce v. Commissioners,* 106 N. C., at page 200, the Court quotes with approval from *Boner v. Adams, "The most* this Court could do would be to order the Auditor *to examine the claim* and report the fact, with his opinion, to the General Assembly."   In *Burton v. Furman,* 115 N. C., at page 169, the Court again cites *Boner v. Adams,* saying: "It was held that *mandamus* would not lie against the Treasurer, because no warrant had been issued, and not against the Auditor, because it was something more than a ministerial duty sought to be

required of him. * * * The principles governing the issue of *mandamus* were *the same then as now, and the decision is a controlling one, in which we fully concur."* This was in 1894. In *Garner v. Worth,* 122 N. C., 250, (1898), it was still the law, for the same Judges that are now on the bench, restate the same proposition and cite the above cases. In *Chemical Co. v. Board of Agriculture and the Public Treasurer,* 111 N. C., 135, it was held that an action to recover back $1,000, wrongfully collected, though paid under protest, could not be maintained because both the defendants were State agents, and the action was in effect against the State. The remedy was by application to the Legislature. If the law so clearly stated and so uniformly repeated be not the law, where shall we look for it, and where shall we find stability in the decisions of the courts?

The repeal of an appropriation has always been sufficient to shut the doors of the treasury against any claimant, but there have been occasions when the Legislature has, as in the present instance, expressly directed that a claim be not paid, notably, for instance, the Resolution of 1870-'71, page 471, forbidding payment of warrants "already made or which may be made" on account of expenses incurred by order of the Governor in the "Holden-Kirk war." No Treasurer and no Court has to this day deemed there was anywhere power to disobey that order of the Legislature, but the power does exist, and has existed all along, if the State can be ordered by the Court in the present case to pay a claim against it. And there is this difference against the plaintiff, he entered upon the discharge of his duties knowing the Legislature had directed he should not be paid, while in the matter of the Holden-Kirk claims the services had already been rendered, the salaries accrued, and the supplies furnished when the Legislature intervened and forbade payment. This power of

the Legislature over the public purse is the most essential one in the system of a government of the people, by the people, and its abandonment under any pretext whatever can never, with safety, be allowed.

In the recent case of *Garner v. Worth,* Public Treasurer, 122 N. C., 250, (February Term, 1898), it was held by a unanimous Court, composed of the same Justices as now: "The Courts can not direct the State Treasurer to pay a claim against the State, however just and unquestioned, when there is no legislation to pay the same; and when there is such an appropriation, the coercive power is applied not to compel the payment of the State's liability, but to compel a public servant to discharge his duty by *obedience to a legislative mandate."* Here, there is not only no legislative mandate, but a positive prohibition. In that opinion, attention is called to the fact that the Eleventh Amendment to the U. S. Constitution was passed to prohibit the Federal Courts from coercing the States, whose sovereignty protects them from subjection to the jurisdiction of any court whatever.

What is the plaintiff's ground for this action? It is that by virtue of chap. 13, sec. 12, of the Acts of 1897, he was appointed "Chief Inspector of the oyster industry" for four years, and that this Court has held in *White v. Hill,* 125 N. C., 194, that chap. 19, of the Act of 1899, creating Hill and six others "Commissioners of Shell-fish Industry," continued in their hands (among other duties) the duties he had been discharging, and therefore the act was unconstitutional in so far as it took away his property in his office. The Court did so hold, and put Hill and the other commissioners out and put the plaintiff back. The Court construing the other parts of the Act of 1899, in connection with the Act of 1897, gave the plaintiff the additional duties, bestowed by the Act of 1899, upon the commissioners created in that Act, and which

were not conferred upon the plaintiff by the Act of 1897. But his title to hold office rests upon the Act of 1897, and *notwithstanding* the Act of 1899—not *under* the Act of 1899. The opinion of the majority of the Court in the present case says: "The plaintiff's office to which he was appointed in 1897 still exists, and he is entitled to hold *the same* and perform its duties. It would seem that he is entitled to receive the salary attached thereto." The Legislature has not, as has been asserted, prohibited the Treasurer "from paying a salary to anyone not acting under chap. 19, of the Acts of 1899. There would be no point or purpose in such a statute. On the contrary, chap. 21, Acts 1899, prohibits him from paying "for services rendered concerning the shell-fish industry, unless such person or persons are authorized to render such services *under the provisions of the said act*" (chap. 19, Acts 1899), and the provisions of the act name the seven commissioners it authorizes to act, and authorizes them alone to fill vacancies in their own body and to employ all subordinates.

The Court held in *White v. Hill, supra,* that the Act of 1899, in putting seven commissioners in office violated the contract made by the plaintiff with the State under the Act of 1897. If so, with whom did the plaintiff make the contract? With the State. If the office is a contract, who has attempted to break it? The State. The Court having in *White v. Hill, supra,* put White back into office, is now asked to order the State Treasurer to open his vaults and pay the plaintiff, as it would order any private individual under similar circumstances. Has the Court that jurisdiction? The Constitution, Art. IV, sec. 9, says not. It says: "The Supreme Court shall have original jurisdiction to hear claims against the State, but its decisions shall be merely recommendatory; no process *in the nature of execution shall issue thereon;* they shall be reported to the next session of the General Assembly for its action."

The Constitution, Art. XIV, sec. 3, says: "No money shall be drawn from the treasury but in consequence of appropriations made by law." This is an exact repetition of the United States Constitution, Art. I, sec. 9, clause 7. Where is the appropriation to pay the plaintiff? There was an appropriation in the Act of 1897 of $900 per annum to pay him for supervising the oyster industry. But the Act of 1899, chap. 19, placed the exclusive supervision in the hands of seven commissioners named therein, and appropriated $400 per annum to pay each of them, and repealed all laws in conflict therewith, and chap. 21 forbids the State Treasurer to pay anyone else. It is true the Court has held that the act was unconstitutional in putting the seven commissioners in discharge of duties which the plaintiff had "contracted" with the State to perform. But that does not repeal the legislative prohibition upon the Treasurer against paying the plaintiff.

The Court has audited this claim, and holds it fixed not at the $900 allowed the Chief Inspector by the Act of 1897, but at $400, which is the sum allowed each of the seven commissioners for discharging that and other duties under the Act of 1899. It directs its mandamus to issue to the Treasurer to pay that sum to the plaintiff, which is "process in the nature of an execution," to enforce collection out of the State, notwithstanding the statute prohibiting payment to anyone unless *"authorized under the provisions"* of chap. 19, Acts 1899, which provisions name those who alone are authorized. This is placed by the opinion of the Court on the ground that "the Legislature having general powers of legislation," its statutes "must be observed and enforced, unless they conflict with the vested constitutional rights of the plaintiff," i. e., unless the State breaks its contract with the plaintiff by the Legislature refusing to pay him the salary to which

he is entitled by virtue of the "contract" he made with the State in 1897, to hold the office of Chief Inspector of the oyster industry. Instead of sending its recommendation to the Legislature, "for its action" as the Constitution provides, the Court is asked by the plaintiff to send its mandamus, which is "in the nature of an execution" (*Fry v. Commissioners,* 82 N. C., 304; *Bear v. Commissioners,* 124 N. C., 204), to the public Treasurer to pay that salary because non-payment "conflicts with the vested constitutional rights of the plaintiff," under his "contract" to hold that office and receive the salary. Though the Court has reduced this from $900 (the contract price), to $400, it is not the saving of a petty $500 which concerns the State, but the assertion by the Court of the power to order payment out of the State treasury of any sum, however small, when the proper department, which is alone vested with such authority, the Legislature, has not ordered such payment, but has forbidden payment. The courts have often held that if the Legislature attempted to do a judicial act, it is null and unconstitutional because beyond their powers. It follows that when the courts attempt to do a purely legislative act, such as ordering payment of a State liability, it is null and unconstitutional because beyond our powers.

An assertion of such power in the Court is so novel, so opposed to all previous adjudications, that it will challenge attention not only in this State, but elsewhere. It is doubtless the first time, in this or in any country, that a Court has issued its order to a public Treasurer to pay a claim which the legislative department has forbidden him to pay. If this can be done, this Court can direct the public Treasurer to pay the "Special Tax" bonds issued under the broad seal of the State, and signed by the Governor and Treasurer, and which the law-making power, for reasons as satisfactory to

itself as the act. here in question, has forbidden the Treasurer
to pay, for if a contract can be enforced against a State, a
constitutional amendment can no more impair the obligation
of such contract than mere legislative enactment. *Louisiana
v. Taylor,* 105 U. S., 445; *Clay Co. v. Society,* 104 U. S., 519.
If the contract of the plaintiff in 1897 to hold office and
receive a salary for four years is a "vested constitutional
right" which the courts can enforce by directing the public
Treasurer to pay, notwithstanding a legislative prohibition,
certainly, the contract evidenced by bonds issued by authority
of the General Assembly, and signed by the Governor and
Treasurer with the public seal attached, which is unques-
tionably a contract, can be enforced by mandamus on the
same ground that an Act of the Legislature "must be
observed and enforced unless it conflicts with the vested con-
stitutional rights of the plaintiff" to receive his money, which
the Court may think the State justly owes him. And the
same would be true as to any other claim which the Court
might deem a valid indebtedness of the State, but which the
Legislature failed to appropriate money to pay. An office-
holder has no greater "vested constitutional rights" in his
salary than any other creditor of this State.

Judged by the provisions of both State and Federal Consti-
tutions, and the unbroken decisions of all the courts, for not
one has been cited that sustains the exercise of this authority,
this Court has no power to direct the public Treasurer to pay
the plaintiff, when expressly forbidden by the Legislature.
Among the numerous decisions of the U. S. Supreme Court
that the courts have no such power, are *Hagood v. Southern,*
117 U. S., 52, which holds that the officer is merely the nomi-
nal party when the object is to coerce money out of the State
treasury, and the action being really against the State, no court
has jurisdiction. In *Cunningham v. Railroad,* 109 U. S.,

446, it is said that "No judgment can be entered against a State through its officers or Treasurer," and in *Louisiana v. Jumel,* 107 U. S., 711, the same doctrine is repeated, the Court pointedly adding: "It needs no argument to show that the political power can not be ousted of its jurisdiction and the judiciary set in its place." To same effect, *Pennoyer v. McConnaughy,* 140 U. S., 1, and many others. In *Osborn v. Bank,* 9 Wheaton, 738, the same high Court says: "Judicial power is never exercised for the purpose of giving effect to the will of the Judge, but always for the purpose of giving effect to the will of the Legislature." The will of the Legislature has been plainly expressed that the plaintiff shall not be paid out of the State's treasury.

Under our Constitution, Art. I, sec. 9, the three departments of government are "forever separate and distinct from each other." To the Legislature belongs exclusively the function of raising money for the public treasury and directing its disbursement. As said in the late case of *Garner v. Worth, supra,* the Court is powerless to issue a mandamus to the Treasurer to pay out a single cent, however just and unquestioned the claim, unless there is a legislative enactment directing him to pay it.

The legislative department may, if it sees fit, acquiesce in this novel assertion of power on the part of the Court. If so, we are witnessing a new development in our history, a profound modification of our organic law which places "the power of the purse," for the first time in the history of the world, in the possession of the judiciary. But the Legislature may not accept this view, for that department, as well as the executive, is equally a custodian of the Constitution with the judiciary, whose duty is to adjudicate private rights and construe the laws made by the Legislature, as it is the duty of the executive to execute them. Though the Court has

often exercised the power to declare void an act which is in conflict with a constitutional provision, it has never gone so far as to order payment of money by the State, where the Legislature has made no appropriation to pay, or has forbidden payment. Neither the executive nor the legislative department is bound by the delimitation of powers which the judiciary may give to itself, for that would be to make this department sole judge of its own powers, however much it might see fit to narrow those of the other two. Like Aaron's rod, it would swallow them up.

The members of the executive and legislative departments take an oath to support the Constitution. Should the Legislature, as they have the highest warrant for doing, hold that the mandamus issued by this Court to the public Treasurer, contrary to legislative enactment, is beyond the constitutional power of the judiciary, the condition of the public Treasurer would not be an enviable one, for an order of this Court outside its constitutional jurisdiction is no greater protection to one who obeys it than a writ of ejectment, or to execute a capital sentence, issued by a magistrate would be to an officer who chooses to obey that.

No one who reads chap. 21, Acts 1899, can doubt that the Legislature meant to prohibit, and does prohibit, the Treasurer from paying the plaintiff, or anyone else claiming his office, as the Court says the plaintiff does, under the Act of 1897. The Court has held that public office is property, and that, by virtue of that property in his office, the plaintiff is entitled to continue to discharge the duties of his office notwithstanding the Act of 1899 gave those duties to others, and that as a consequence the plaintiff is entitled to his salary. If that be granted, the Court can certainly go no further. It can not take charge of the public treasury and adjudge that,

because the State has violated its contract and the Court has restored the plaintiff, the State shall pay him.

It is true *Hoke v. Henderson*, 15 N. C., 1, held that a public office was private property—a decision unsupported by any decision of any other court, anywhere—but it limited the decision to saying that the officeholder's property was in his "emoluments," and expressly says (p. 27), that if the Legislature should refuse to give officers salaries or to pay them, "this would be a plain breach of constitutional duty, and yet the Court could give no remedy," and *Hoke v. Henderson* also expressly admitted that the Legislature could abolish any office created by the Legislature. The recent decision in *Day's case* (124 N. C., 362), which holds that an officeholder has property not merely in the emoluments but in the duties of his office, which he may claim as long as those duties are continued, makes it practically impossible to abolish any office having duties necessary to be continued (as is the case with most offices), and the later cases of *Wilson v. Jordan*, 124 N. C., 683, and *Abbott v. Beddingfield*, 125 N. C., 256, hold that as long as there is legislation on the same subject-matter—*in pari materia* as it is termed—the former office is not abolished, though the new act may expressly so declare (as in *Wilson v. Jordan*), and though the new office may have a different title and different duties, and added duties, as in *Abbott v. Beddingfield*, and *White v. Hill*. If to this indestructibility of a legislative office, for the term of the incumbent, however long, the Court has the power, now asserted for the first time in the history of jurisprudence, to coerce by its writ payment by the State of the old officer, legislative power over government, which is most largely exercised by the shaping of public agencies, is at an end. Whenever one Legislature shall create an office, for no matter how long a term, so long as similar duties are discharged subse-

quent Legislatures are powerless to get rid of the incumbent, and the Court will see that the public pays him. The assertion of such vast power by the Court over the operations of the legislative department, challenges its denial by that department. · Should the Treasurer, under legal advice, deem the action of the Court in excess of its just constitutional powers, will the Court put him in jail for disobedience? Should the Legislature, whose action in forbidding payment the Court treats as unconstitutional because impairing "the vested constitutional rights" of an officer to receive a salary, return the compliment by holding unconstitutional the action of the Court in assuming jurisdiction over the public treasury, what then will be our condition?

The people of North Carolina control their treasury through their representatives in the General Assembly. If the General Assembly levies taxes in excess of what should be levied, or less than is necessary, the Court can not correct this. If the General Assembly be too extravagant in its appropriations on the one hand, or on the other shall withhold appropriations to pay debts which the Court deems just and meritorious, the Court can not compel a different conduct on the part of the coordinate branch in the discharge of the functions entrusted to it. The people alone can supervise such action of their representatives when acting within the sphere of their duties, by the election of another General Assembly, or, as was said in *Hoke v. Henderson*: "It must be left to the action of the citizens at large to change unfaithful for more faithful representatives."

It is true that, if the Court can not coerce payment of an officer's salary, the decisions, peculiar to this State, that an office is property based upon a contract, are futile, since the Legislature hereafter, in removing the incumbents of a legislative office, need only to add a clause that the removed offi-

cer shall not be paid.  But may it not be that such result
demonstrates the possibility that the decisions of this State
are incorrect, and the uniform rulings of other courts are cor-
rect, based as they are upon the principle that the Legisla-
ture alone has the power to create officers, and to pay or to
refuse to pay them, when not created by the Constitution.
But at any rate, a claim for salary is of no higher dignity
than any other indebtedness of the State, and the office-
holder has the same remedy as all other creditors of the State
—an appeal to the sense of right among the people, which
always will be surely expressed by them, sooner or later,
through the Legislature—and he has no more.

No stronger proof of the inadmissibility of the plaintiff's
application can be had than the three cases which, after the
most diligent and thorough research, his counsel have pre-
sented to the Court in support of the claim that the Court
has power to order the Treasurer, by mandamus, to pay a
salary which the Legislature has forbidden him to pay.

Firstly: *Marbury v. Madison*, 1 Cranch, 137.  In that
case the mandamus was *refused*.  That case was where the
commission of a Justice of the Peace for the District of
Columbia had been signed by the outgoing President, Mr.
Adams, and the new Secretary of State, Mr. Madison, refused
to deliver it.  Marbury applied for a mandamus.  MAR-
SHALL, C. J., wrote an elaborate opinion, expressing his views
of government and of the functions of the judiciary, antag-
onistic to those known to be entertained by President Jeffer-
son, the new Executive, saying, in substance, that Marbury
was entitled to have his commission, and that the opinions
of the judiciary ought to control in such matters, but con-
cludes by *deciding* "the authority  *  *  *  to issue writs
of mandamus to public officers appears not to be warranted

by the Constitution," and denied the writ, and Marbury never got his commission. The entire discussion in the opinion, however able and interesting, is therefore a discussion of abstract questions of law, and the case, for now near a century, has been cited to law students by their instructors as an able opinion which was entirely and altogether *obiter dicta,* the decision of the Court, being that it was without jurisdiction of the subject-matter. Yet the relief there denied, a mandamus to the Secretary of State to deliver a commission signed and sealed, which the departing President had inadvertently failed to deliver, was by no means equal to the assertion of power here asked of the Court to issue a mandamus to the public Treasurer to pay the public money which the legislative power has levied and placed in his hands, and from which it has directed him not to pay to this plaintiff.

But neither in the wide range of the discussion in *Marbury v. Madison,* nor in any other case which the most minute research has found, has there ever been a decision by any court that there was private property in public office, or that the office was a contract between the State and the officer, save only the cases in this State based upon *Hoke v. Henderson,* and the expansion of that doctrine by recent decisions of this Court, the logical result of which later cases (but not of *Hoke v. Henderson,* which denies the power), may be the power claimed for the courts by the present application to enforce such "contracts" by issuing our mandamus to open the public treasury. In several decisions the United States Supreme Court has explicitly and expressly denied that there was, or could be, from the nature of things, any property or contract as to a public office—notably in *Butler v. Pennsylvania,* 10 Howard, 51 U. S., 402; *Newton v. Commissioners,* 100 U. S., 548; *Crenshaw v. U. S.,* 134 U. S., 99; see quotations, 125 N. C., pp. 274—279. In the

famous Dartmouth College case, 4 Wheat., 629, Chief Justice Marshall, while holding that the Legislature could not revoke a charter because that was a contract (before the provision since inserted in State Constitutions to the contrary), expressly says that Legislatures unquestionably have the right to change or abolish offices created by legislative enactment, because they are governmental agencies, and, unlike charters, are not held by virtue of any contract.

In a very recent case, *Keim v. U. S.*, decided April 9, 1900, 20 Supreme Court Reporter, 574, the United States Supreme Court held that except where protected by express constitutional or statutory provisions "the power of removal is incident to the power of appointment," and that where an officer is thus removed "the courts can not issue mandamus either to reinstate him or to compel payment of his salary." Thus, that Court disavows the power in the judiciary, in both particulars, which this Court is asked to assert. The plaintiff, not being a constitutional officer, is not protected by any constitutional provision, and can not be protected by legislative provision when it is by legislative enactment that he has been removed.

In a still more recent case in the United States Supreme Court, in which the opinion was filed yesterday (May 21), in the contest over the governorship of Kentucky, *Taylor v. Beckham,* the question was presented whether an office was "property," and therefore protected by the Fourteenth Amendment. The case was of unusual importance, and was argued by able and eminent counsel. The Court, speaking through Chief Justice Fuller, after quoting numerous cases all holding that public offices are mere agencies or trusts, and not property as such, and that the salary and emoluments are not property, secured by contract, but compensation for services only when actually

rendered, says: "In short the nature of the relation of a public officer to the public is, generally speaking, *inconsistent with either a property or a contract right.*" If there was anything in the *obiter dicta* in *Marbury v. Madison* which might be justly construed as favoring, by implication, a different doctrine, there is no *obiter,* and no possible doubt as to the meaning of this latest enunciation of the highest Court in the land—an enunciation which the opinion itself shows is in conformity with the uniform decisions of that Court, and required by the very conception of the nature of an office which belongs to the public, not to the individual who is assigned to discharge its duties at the will of the appointing power and subject to removal at the will of the Legislature, except when the Constitution fixes the term.

Secondly, *Cotten v. Ellis,* 52 N. C., 545, was a case in which the Court expressed the opinion that because Cotten's office had been created by Act of Congress, the Legislature had no power to abolish the office (as it could do with offices created by legislative enactment), and that consequently the salary was like the salaries of those officers who were protected by express constitutional provision from legislative abolition, and could not be taken away. The Court issued an alternative mandamus, i. e., a notice to show cause why a mandamus should not issue, but intimated very clearly that a peremptory mandamus (as here asked) could not issue, saying, "we do not enter upon the inquiry how it could be enforced." In a still more recent case (*Blount v. Simmons,* 119 N. C., 50), the Court, speaking through FAIRCLOTH, C. J., while adjudging the State liable for certain obligations, was careful to add: "How the judgment will be satisfied is a question not now before us." But it was soon before the Court upon an application for a mandamus upon that very claim in *Garner v. Worth Treasurer,* 122 N. C., 250, in which it was held,

as above stated, by a unanimous Court, composed of the same Justices as now, that "the courts can not direct the public Treasurer to pay any claim against the State, *however just and unquestioned,* when there is no appropriation to pay the same." Here, there is not only no appropriation, but an Act of the Legislature forbidding the Treasurer to pay the plaintiff. In *Burton v. Furman,* 115 N. C., 166, the Court refused a mandamus to the Auditor and Treasurer, such as is asked here, though there was an appropriation, because "there was no sufficient provision to pay the plaintiff," the amount, as in the present case, being disputed.

Thirdly, *County Board of Education v. State Board of Education,* 106 N. C., 81. The Court held that the State Board of Education, being an agency of the State, could only be sued because the Legislature had authorized and directed that it might "sue and be sued." It also held that a mandamus might issue "to compel public officers to discharge a mere ministerial duty, not involving an official duty"—that is, where the statute directs them to perform a certain duty. That would be the case here if the Legislature had directed the Treasurer to pay the plaintiff a certain salary, but it is not a ministerial duty, nor a duty at all, when the Legislature has told him, as in this instance, not to pay the plaintiff. If the case of *Ward v. Elizabeth City,* 121 N. C., 1, cited by Mr. Justice MONTGOMERY, and which was decided by a unanimous Court, had been followed, all the line of cases from *Day's* to *"White v. Ayer,"* would have been decided in accordance with the dissenting opinion in these cases, as a glance at *Ward v. Elizabeth City* will sufficiently show.

The three cases cited for plaintiff certainly do not sustain his contention, and the utmost research has not brought forward any other, from any court whatever, that will justify this Court in directing payment of this, or any liability by

the State treasury when there is no appropriation by the Legislature, unrevoked, to pay it.

The plaintiff's contention rests upon two fallacies: First, that the agencies, created for mere governmental purposes, are "contracts," and if that is conceded, that the State can be forced by the courts to execute the contract and to pay the salary. Whether a sovereign State will perform its contract and pay out money under it, must ever be left solely to the sense of right and justice in the sovereign. This is inherent in sovereignty, and everyone, who makes any contract of any kind with a State, does so with the knowledge that this right is safeguarded and reserved to each State by the Eleventh Amendment to the United States Constitution, and by express provision in the State Constitution.