PROVO STY, J.
The relator alleges that the city council, desiring to remove him without cause from the office of city auditor, first passed an ordinance expressly so providing, and then, on discovering that it had no right to do so, recalled the ordinance, and immediately proceeded to do by indirection what it could not do directly, namely, to pass another ordinance making the office undesirable to any one competent to fill it, thereby practically abolishing it. This it did by reducing the salary of the office from $1,500 to $300 a year, and delegated to the mayor the power to designate what hours -the city auditor should keep at the city hall. Relator asks for a mandamus to the mayor and members of the council directing them to restore the salary to $1,500 a year.
Six out of fifteen councilmen, being tire minority members of the council, filed answers in this suit averring that in their opinion the salary of the relator ought to be $1,200 a year. The seven majority members and the mayor filed an exception of no cause of action; and, on its being overruled, filed an answer. In this answer the councilmen allege that they fixed the salary of the relator in the exercise of the discretion vested in them by the city charter, and that the court is without jurisdiction to control that discretion; that they acted in good faith, in the public interest; that the relator continued to discharge the functions of the office after this reduction had been made, and is therefore estopped from contesting; that a competent person can be secured for the position at this reduced salary; that the relator “is grossly incompetent, disrespectful, officious, and meddlesome,” and has neglected his public duties at various times; that he is particularly incompetent, in that he is not a stenographer; that he has been guilty on many occasions, while in the discharge of his duties, of insubordination, particularly in his published interviews regarding the city administration; that he is officious, particularly in his personal conduct and demean- or, at all times while in the discharge of his duties; that:
“I-Ie has not kept the hours at the city hall as designated by the mayor, but has left his post of duty when needed on several occasions, and when expressly instructed by the mayor to remain.
“Third. That he is guilty of misconduct in office, particularly in seeking to compel said mayor and council to pay him a higher salary than the services incident to the office will justify or the administration of the city’s affairs make necessary, and is prosecuting suits against the city and its board of trustees in his official capacity, in which he makes under his oath false and untrue charges against the council and its members; that he has been guilty of malfeasance in office, particularly in this: that, while acting as secretary to the council, he wrongfully and illegally embodied into the minutes of a meeting held by said council. on the - day of-, 1909, a certain protest filed by himself, and which was no part of the records, proceedings, or actions of the council, and caused same to be published in the official journal of the city as a part of its minutes, and had the city charged with the expense of its publication.
“Fourth. That the services of the city auditor are no longer worth exceeding $300 per year; that said sum is commensurate with the nature and character of the services to be performed ; that the council, in the exercise of its discretion, has fixed the salary at $300 per year; that the office of city auditor was created when the city was doing extensive paving, grading, and improving work, which unusual and extraordinary work made creation of the office imperative, but that said work has been completed, and the duties now devolving on said auditor are quite insignificant and unimportant, and do not justify a salary exceeding said sum.”
The charter of the city of Shreveport (Act No. 158, p. 308, of 1898, § 22) creates the office of city auditor, makes the officer eligible by the city council, and provides that he shall hold his office until the expiration of the term of office of the members of the council by whom he was elected. The char *181 ter authorizes the council to remove by a majority vote any officer or employe “for incompetency, neglect of duty, malfeasance in office or when the service of such officer or employé he no longer necessary to the public interest.” It defines the duties of the city auditor, and provides for his compensation, as follows:
“The city auditor shall be ex officio secretary of the council, keep a record of all proceedings, attest all ordinances, receive and file all papers belonging to the council, and shall prepare two copies of the assessment roll and file one with the clerk of the court of the parish of Caddo, and the other in the office of the city comptroller, and the said council shall fully define the duties of the auditor, and may impose upoon him any duties herein defined as those of the comptroller, except those of collection of taxes and licenses, and shall fix his salary not to exceed $1,200 per annum, and shall give bond in a sum to be fixed by the council.”
By Act No. 192, p. 344, of 1906, this was amended so as to increase to $1,500 the maximum amount at which the council may fix the auditor’s salary.
The council fixed the auditor’s salary at this maximum amount of $1,500; imposed upon him the duties of auditing the books of the comptroller and other officers, and of acting as secretary of the mayor and of the several committees of the council. This was the situation when the relator, Thurmond, was elected to the office of city auditor as his own successor, in November, 1908, at the going into office of the present city council.
On December 15, 1908, an ordinance was introduced in the council reading:
“That the services of the present incumbent of the office of city auditor be and the same is hereby declared no longer necessary in the public interest, and that T. H. Thurmond, Esq., be and he is hereby removed therefrom.
“That the mayor be and he is hereby authorized and empowered to employ a secretary who shall be a stenographer and whose duties shall be to assist the comptroller, and who shall also be secretary to the mayor and such other officers as may be prescribed from time to time by the mayor or council, and whose compensation shall be the sum of nine hundred ($900) dollars per annum, payable monthly.”
On motion, this ordinance went over to the meeting of January 12, 1909. It was then voted on, but failed to secure the requisite number of votes. Thurmond filed a protest, denying the right of the council to remove him. The ordinance came up again' at the meeting of January 19, 1909, and was then adopted, by a vote of eight to five, the council 'being composed of 15. At the meeting of February 4, 1909, the “action of removing the city auditor was reconsidered,” and the relator was “reinstated.” At the meeting of February 9, 1909, the following resolution was adopted by the council by a vote of eight to six, two of the members being absent, to wit:
“Defining the duties of the city auditor, and fixing compensation.
“Be it resolved by the city council of Shreveport, in legal and regular session convened, that the city auditor be ex-officio secretary to the council, the mayor and all committees, and shall perform all duties defined by the city charter as incumbent on him, and shall have such hours at the city hall as the mayor may designate.
“Be it further resolved, etc., that the salary of said auditor shall be the sum of three hundred dollars per year, payable monthly.”
At the meeting of April 16,1909, the finance committee reported the following to the council, and recommended its adoption:
“Annual Salaries of City Officials and Employés.
“Mayor, $2,000. Comptroller, $1,800. Auditor Secretary, $900. City Attorney, $2,000. City Physician, $600. Extra for attending pest house, $400. Street Commissioner, $1,500. Asst. Street Commissioner, $1,000. Plumbing Inspector, $960. Sexton, $900. Pound Keeper, $900. City, $1,200. 2 Helpers, $1,200. Building Inspector, $300. City Hall Janitor, $480. Helper, $260.
“Total, $18,440.00.”
The majority councilmen made no attempt whatever to substantiate the defenses based upon their having had cause for removing the relator.
For explaining the great reduction in the salary of the relator, they showed that there had been a great reduction in the income of the city caused by the adoption of prohibi *183 tion, which cut off the revenue theretofore derived from the saloon licenses, and that no works of public improvement were going on for the moment, so that the work of the auditor’s office had greatly fallen off; and that the relator was not a stenographer, and it was necessary to hire a stenographer to do much of the work which properly fell to him.
As a matter of fact, the evidence shows but a very insignificant cut in the salaries of officers. The salaries of the mayor, chief of police, and chief of fire department were not reduced. In fact, the evidence does not show any reduction in' salaries, except in that of the comptroller, which was reduced $50 a month, he now getting $1,800 a year. The city attorney stated at the bar, in the course of the argument, that his salary had been cut from $1,500 to $1,200. The street commissioner’s salary was raised from $1,000 to $1,-500, but additional duties were placed upon him. There had theretofore been two assistant street commissioners at $100 (?) apiece. One of them was dispensed with, and the salary of the other raised from $100 (?) to $1,000. We imagine this $100, must be a typographical error. The other officers are the city physician, plumbing inspector,- sexton, pound keeper and two helpers, building inspector, city hall janitor and helper. The evidence does not show whether their salaries were reduced.
The evidence shows that the relator is a good bookkeeper and highly competent. The minority councilmen, and several ex-mayors and other ex city officials, testified that a reasonable salary for the work which the charter and the ordinances impose upon the auditor would be not less than $75 a month; that the salary of $25 is ridiculous, and that no competent person could be procured to accept the office at that price. Not one of the defendants testified; and they called but one witness, the comptroller, who thought that a salary of $900 would be reasonable, and agreed with the witnesses for relator that the amount of $25 was ridiculous, and could! not be viewed in any other light than as a “notiGe to quit.”
Upon the foregoing facts, there can be no-difference of opinion but that the majority of the city council have sought to remove the relator from office by starving him out, and . placing him under the beck and call of the-mayor. The charter confides to the council itself the power of defining the duties of the-auditor; the attempt to delegate this power to the mayor is in itself a violation of the charter.
The learned city attorney and the other learned counsel appearing for the city take the position that the discretion which the-city charter confides to the council of fixing the salary of the city auditor cannot be controlled by the courts. And we infer that the defense of the case was conducted on that theory in the lower court, since the majority councilmen were not put on the stand to testify regarding what had been their real object in thus, cutting off the city auditor to-a salary manifestly inadequate.
Before entering upon the discussion of the case,[1] we deem it well to say that, the city auditor being an officer created by the-charter, with certain specific duties prescribed by the charter, and which must be performed by him and can be performed by no one else, the office is not one of those which the council is authorized by the charter to dispense with whenever no longer necessary, and that defendants do not pretend that it is. The office cannot possibly cease to be necessary, since several of the functions attached to it by the charter are essential to the operation of the city government.
In support of the contention that the courts are powerless to interfere with the discretion confided by the charter to the city council, the learned counsel for defendants refer to no authority, except the recent decision of *185 this court in the case of Gentry v. Village of Dodson, 49 South. 635.[1] But what the court held in that case was that, “under the cir•cumstances disclosed by the record” in that particular case, the court could not interfere ; and the circumstances of the case •are stated by the court as follows:
“The village of Dobson contains about 1,000 inhabitants. Its revenues during the year 1900 frpm all sources (including fines, $410) aggregated $1,711.73; of which amount $1,464 was paid out in salaries of the officers, leaving ■only $274.73 for the improvements of the streets •and pavement and all the other municipal ■expenses. Of the amount paid out in salaries, the mayor (T. G. Payne) received $240, and the marshal (R. R. Gentry) received $1,000, making $1,240, much more than half the total amount collected. Among the voters there ■seems to have been some dissatisfaction flowing ■out of this condition of affairs, as the campaign in 1907 was conducted upon a platform ■of more economic administration of public affairs, and the party advocating the economy ■elected their ticket, at least the aldermen and "marshal.
“After the installation of this new board of ■aldermen, true to their platform, they materially reduced the salaries of the village officers. 'The salaries of- the aldermen were abolished ■altogether, each alderman agreeing to serve without pay. The salary of the mayor was reduced from $240 to $70; that of the clerk from $40 to $25; that of the attorney reduced from $100 to $35; and the salary of the^ marshal was reduced from a guaranteed salary •of $65 per month (in reality above $1,000) to a salary of $15 per month. This they supposed would leave them about $600 for the improvements of the streets, instead of a small amount (say about $274.75) formerly left for both streets and other miscellaneous expenses outside of salaries.
“Mr. Campbell, the newly elected marshal, after the salary of the office had been reduced to $15 per month, and after serving several weeks under this salary, became dissatisfied, and, pursuing the only course open to him, resigned.
“The Governor, on the 17th day of October, 1907, appointed the plaintiff, R. R Gentry, marshal, to fill the place made vacant by the resignation of Campbell, the salary to which ■office had been previously fixed at $15 per month; but in the meantime, and before he took the oath and gave bond as marshal, that office had been divorced from the offices of street commissioner, tax collector, and tax assessor, and the salary fixed at $1 per month, $1 for each arrest, and 10 per cent, of all fines collected.”
Very far from being committed to the doctrine that the courts are powerless to interfere in’ cases of abuse of discretionary power by municipal councils and police juries, this court, after the most mature consideration, has deliberately committed itself to the very opposite view. Evans v. Police Jury, 114 La. 767, 38 South. 555; Davis v. Police Jury, 120 La. 163, 45 South. 47; Denis v. Shakespeare, 43 La. Ann. 93, 8 South. 893.
No doubt, the power which creates may destroy. Where the Legislature, or a municipal council, has created an office, it may destroy it. Where either has the discretionary power of removal, it may exercise it without let or hindrance. The acceptance of an office does not create a contract between the officer and the political body under which the office is held. An officer has no proprietary interest in the office, but he holds it simply in, and subject to, the public interest. On all these points an abundance of decisions may be found-all upholding the right to remove the officer, or to reduce or abolish altogether his salary. But where the Constitution creates an office, the Legislature cannot abolish or nullify it, either by direct or indirect means; and, where the Legislature creates an office, a city council cannot abolish or nullify it, either by direct or indirect means. And, if either the Legislature or a city council sought to do by indirection what it thus could not validly do directly, the duty of the courts to interfere would be perfectly plain. In the case of the Legislature, its attempt to override the Constitution by indirection would be held to De unconstitutional; and in the case of a municipal council mandamus would lie.. Code Prae. art. 829; Denis v. Mayor, 43 La. Ann. 93, 8 South. 892. For instance, the offices of sheriff, clerk of court, etc., are created by the Constitution, and the fixing of the fees of these officers is left to the discretion of the Legislature. Would any one say that the Legislature could *187 indirectly abolish these offices, or remove these officers, by assigning their duties to other officers, or by so reducing the fees of the office that no one would undertake to perform the duties? It stands to reason that a municipal council cannot abolish or nullify an office created by the Legislature, and cannot, directly or indirectly, remove without cause an officer whom it is authorized to remove for cause. If, instead of merely reducing the salary, the council abolished it altogether, no one hut would say that such action was illegal and could be rectified by the courts. It would he a palpable disregard of the charter, and a violation of the duty which the charter imposed upon the council to fix the salary. But what practical difference is there between such a case and one like the present, where, as shown by the evidence, the salary is fixed so low that no competent person would accept the office; where the ostensible fixing of the salary is a mere mask for abolishing the office or removing the officer? Is the illegality of the action of the council to escape the vision of the courts simply because it is masked? Are the courts to be circumvented by a plain subterfuge?
Upon that point, the decisions in other jurisdictions, so far as we have been able to find, are all one way. Thus:
In Reid v. Smoulter, 128 Pa. 324, 18 Atl. 445, 5 L. R. A. 517, the Supreme Court of Pennsylvania said:
“It will not be seriously contended that the Legislature had any power to pass upon the necessity for the appointment, for this discretion is expressly committed to the clerk, who is to act with the consent and approval of the court. Nor will it be pretended that the assistant clerk might be removed from bis office by a simple act of the Legislature.. There was no power competent to remove him save the tribunal which conferred the appointment.
“If the Legislature may repeal the act adjusting the salary without making any further or other provision in that behalf, it may practically abolish the office. If the assistant clerk may thus be deprived of the office, the clerk of court and judge are both liable to the same fate, and in this way that might be done by indirection which could not be done directly. It is true that the salary is a matter which, by the Constitution, is submitted to the discretion of the Legislature. In the exercise of that discretion, by the act of 1874 (P. L. 200), the salary was fixed at $1,500, and this rule of compensation will continue until by some other statute it is changed. The salary first fixed may perhaps be increased or diminished, subject to the restriction of the thirteenth section of the third article of the Constitution, as the Legislature should from time to time see fit to provide; but to repeal the provision for a salary-altogether is to remove a clerk from his office.”
In White v. Worth, 126 N. C. 570, 36 S. E. 132, the Supreme Court of North Carolina said:
“The Legislature may abolish a legislative office, and this is the end of it. Hoke v. Henderson, 15 N. C. 1, 25 Am. Dec. 677. When the office is abolished, this ends the term of the officer holding it, as there can be no officer without an office, and, of course, no salary without an officer. The Legislature may reduce the salary of an existing legislative office, if this is done for the benefit of the public, and not for the purpose of injuring the incumbent or to starve him out. But, if it clearly appears that it was done for that purpose, it would be void. State v. Gale, 77 N. C. 283; Hoke v. Henderson, supra. In cases where only a part of the salary is taken from the officer, it would have to appear from the legislation itself that the .object was unlawful, or the courts would not interfere. Hoke v. Henderson, supra. But if the Legislature should undertake to deprive the officer of the whole of his salary, while his office still continued, the intent would so plainly appear that the act would be declared void. Hoke v. Henderson, supra; Cotten v. Ellis, 52 N. C. 545.”
In People v. Burby, 17 App. Div. 165, 45 N. Y. Supp. 347, it was field tfiat (quoting syllabus) :
“The Legislature had no power to deprive a constitutional officer of his fees by relieving him of the duties of fiis office, and providing that, if he exercises such duties, he shall be entitled to no compensation.”
In tfiis same case the court quoted approvingly the decision of the Supreme Court of Pennsylvania, supra, in Reid v. Smoulter, as follows:
“It has been held that merely depriving an officer of his fees was equivalent to depriving him of his office, and was unconstitutional.’,’
*189 In Bunting v. Gales, 77 N. C. 285, the court said:
“Neither can the Legislature take away the entire salary of an officer” — citing Cotten v. Ellis, 52 N. C. 545.
In Wesch v. Common Council, 107 Mich. 149, 64 N. W. 1051, which is the decision apparently opposed to the foregoing decisions, the court said:
“The petition does not aver that the duties of the officer continue as they were prior to the petitioner’s appointment, and does not state what portion of relator’s time has been taken up with the performance of the duties of the office, nor does it allege that the action of the council was factious. Bad faith or improper motive cannot be inferred from the facts stated, or presumed in the absence of statements upon which an inference can be predicated; and we must therefore assume that good reasons existed for the reduction of the compensation from the former figure, and the payment of a mere nominal salary. When the petitioner was appointed, he knew that the salary of the office had not been fixed for the term for which he was appointed. His appointment and acceptance was subject, not only to the right of the council, but to its duty as well, to fix the salary. Fournier v. West Bay City, 94 Mich. 463, 45 N. W. 227.”
That case is clearly and plainly differentiated from the instant case on its facts. The allegations which are said not to have been made in that case are distinctly made in the instant case, and, what is more, are proved.
The case of Board, etc., v. Westbrook, 64 Miss. 312, 1 South. 352, decided by the Supreme Court of Mississippi, is identical with the one at bar in all essential particulars. The syllabus of the case reads as follows:
“The board of supervisors of a county, wishing to abolish the office of chief health officer of the county, and not having the power to do so directly, sought to accomplish that result by reducing the salary of the officer to a mere nominal sum — .$1 per month. Held, although Rev. Code Miss. 1880, § 790, imposes upon the board of the supervisors the duty of fixing the salary of the chief health officer of their county, yet the laws for the protection of the public health, being of general application, cannot be nullified in any county by the board fixing the salary at a rate so low that no competent physician will accept the office.”
See, to the same effect, Morris v. Glover, 121 Ga. 751, 49 S. E. 786, where the Supreme Court of Georgia said:
“Can the Legislature by indirection accomplish what it is restricted from doing by the organic law of the land? Among the incidents of public office are the discharge of its duties and the enjoyment of its emoluments by the individual entitled to the office. * * * The duties and emoluments are of the substance of the office; its name but the semblance. * * * An office created by statute, but not defined in or recognized by the Constitution, may be abrogated by statute. But where an office is created or guarded by express constitutional provision, its scope cannot be enlarged or lessened by statute, nor can the office be filled in any other manner than that prescribed by the Constitution. * * * It has been held that the taking away of the salary amounts to the abolition of the office. Reid v. Smoulter, 128 Pa. 324, 18 Atl. 445, 5 L. R. A. 517.”
For a long list of decisions on the same point, see 23 A. & E. E. 406, in support of the text:
“Where the term of office is fixed by the .Constitution, the Legislature cannot extend or abridge the term so fixed, either directly or indirectly.”
See, also, 29 Cye. 1396.
See, also, cases cited at page 421 of 23 A. & E. E. in support of text:
“Though the tenure and compensation are fixed by statute, the Legislature cannot abolish an office of constitutional origin by a colorable reduction of the compensation or by taking it away altogether.”
Changing “Constitution” for “statute,” and “city council” for “Legislature,” and the text here quoted covers the present case exactly.
It goes without saying that in all such eases the court could interfere only where upon the facts it was perfectly plain that the reduction of the salary was resorted to merely as an indirect or colorable means of abolishing the office or of removing the incumbent. Of course, in such cases every intendment would have to go in favor of the action complained of. For instance, in the case of Gentry v. Village of Dobson, supra, this court refused to interfere, although the *191 •circumstances gave rise to a very strong ■suspicion that the sole motive was to get rid of the officer. In order that the court should have grounds for interfering, the evidence would have to show as a matter of fact that the action complained of was purely and simply an attempt to do by indirection what could not be done directly; an attempt on the part of the municipal council to override or nullify the charter. In the present instance, denial is made in the pleading and in the argument of counsel that such was the intention, or that such would be the •effect or operation of the action complained •of; but on the evidence, no attempt, or, if ■any, none but the feeblest and most .perfunctory, has been made to disguise the plain fact that such was the intention and such would be the result. This court cannot base its .judgment upon a denial in the pleading, or upon a denial in the argument of counsel, but must base it upon the evidence. The ■evidence shows that the lowest reasonable .salary for the office of city auditor, as the duties of that officer are at present fixed by statute and by ordinance, would be $75 a month. The court will not fix the salary, hut will make the mandamus peremptory to the extent of ordering that it be fixed at not less than the amount of $75 as long as the duties of the officer shall remain as at present fixed.
The upper limit of $1,200, afterwards raised to $1,500 by the Legislature, affords some indication of what the salary of this officer should approximately be.
The judgment appealed from is modified so as to read: It is ordered, adjudged, and decreed that the writ of mandamus herein issued to the city of- Shreveport and the trustees, members of the city council, be and the same is hereby made peremptory to the extent of ordering the said council and the individual members thereof to meet without delay and fix the salary of the city auditor of said city at not less than $75 per month, to date from February 1, 1909; and that the cost of the lower court be paid by the city of Shreveport, and those of the appeal by the relator.
NICI-IOLLS and MONROE, JJ., dissent.

 123 La. 903.