RAMÓN BANUCHI, Mayor of Isabela, Petitioner and Appellee, v. MUNICIPAL ASSEMBLY OF ISABELA, Respondent and Appellant.

No. 4491.   Argued February 24, 1928.—Decided March 29, 1928.

R. Cuevas Zequeira for the appellant.   V. M. Fernández and J. Valdejulli for the appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

This is a certiorari proceeding brought in accordance with section 65 of the Municipal Law of 1924, page 106, by Ramón Banuchi, Mayor of Isabela, against the Municipal Assembly of Isabela.

The petition is long and accompanied by several lengthy documents. It was filed on June 25, 1927. The facts may be summarized as follows:

Mayor Banuchi, with the concurrence of the municipal treasurer, prepared the budget for the fiscal year 1927–28 and submitted it to the assembly. At its session of May 11, 1927, the assembly took it under consideration and after the introduction of radical changes, approved it and sent it back to the mayor for his approval. The mayor returned it with his veto and the assembly approved it again by a vote of two-thirds of its members, thus putting it into effect. The mayor then resorted to the court for justice, contending that instead of acting within its powers to amend the budget, the assembly had gone beyond them and changed the budget in such a manner as to annul the intervention of the mayor and the possible intervention of the tax-payers; that the action of the assembly was also contrary to the Organic Act of Porto Rico because it reduced the salaries of officers during their terms of office, and that the budget finally approved was void because the changes therein made had not been inspired by public necessity or convenience, nor were they in accordance with the receipts and expenditure of previous fiscal years, nor was it possible to secure, on account of the salaries assigned to certain offices, the services of competent persons, no provision having been made moreover for the payment of certain debts contracted by the municipality.

The following were the most important changes made by the assembly in the budget prepared by the mayor:

Reductions in receipts: From $708.75 to $533.52 in the revenues from taxes on meats; from $2,651.68 to $1,836.48 in revenues from the electric plant; from $106.50 to $78.12 in receipts from fines of the justice of the peace court, and from $2,357.98 to $2,000 in the item of "interest."

In expenditures the following changes were made:

The appropriation of $100 for supplies in the office of the school inspector was increased to $150. The appropriation for rent of the house of the said inspector was raised from $240 to $300, that of $50 for his traveling expenses was raised to $100 and that of $50 for traveling expenses of the assistant inspector was raised to $100. The $300 appropriated for school supplies was raised to $400. The salary of the first janitor of the schools was increased from $240 to $300, and that of the second janitor from $150 to $200. Instead of $285 for purchase and repair of school equipment, $600 was appropriated.

On the other hand, the salary of the school director was reduced from $600 to $120 and the item of $334.70 for incidental school expenses to $54.70.

The mayor's salary fixed at $900 was *reduced* by the assembly to $1, with a reduction in the appropriation for supplies for his office from $100 to $50.

The sum of $100 appropriated for repairing streets was reduced to $10 and that of $100 for the repair of roads to $1.

The sum of $150 fixed by the mayor for charities was reduced to $50. On the other hand the appropriation of $75 for coffins for the poor was raised to $100.

In the budget prepared by the mayor was the following: "Scholarships. For student in the College of Agriculture and Mechanical Arts of Mayagüez, $100." The assembly ordered: "That an amendment be added to the item fixed for a scholarship in the School of Agriculture and Manual Arts of Mayagüez to the effect that the amount of $100 assigned for that purpose shall be for Arturo Riollano, a youth of this town."

The salary of the director of charities was reduced from $2,100 to $1,500.

The salary of the clerk of the civil registry was reduced from $900 to $600.

The appropriation of $100 for fire insurance was eliminated.

The salary of the assistant operator in the electric plant was reduced from $480 to $360. And the appropriation for fuel for that plant fixed at $1,372 was raised to $2,000.

The salary of the keeper of the slaughterhouse was reduced from $300 to $125, and that of the keeper of the cemetery was raised from $300 to $360.

Finally, the appropriations of $701.15, of $645.40, of $502.19 and of $29.25 set apart in the mayor's budget for paying debts contracted by the municipality with West India Oil Co., Texas Co., Félix R. Hernández and Georgino Cortés, were eliminated "for the same reasons set forth by the assembly on approving the ordinary budget for the fiscal year 1926–27 in which the said debts were not recognized."

Apart from the foregoing reasoning the minutes do not show any ground for the resolutions adopted in relation to the expenditures. An assemblyman would submit a proposition without giving a reason therefor; his proposition would be seconded; no objection would be raised, and it would be approved by a unanimous vote or with a single vote against it. According to the minutes, when fixing the mayor's salary at one dollar per year the following occurred:

"3. It is proposed to fix the mayor's salary at one dollar yearly. Seconded by Mr. Muñoz. The matter is submitted to discussion and is opposed by Mr. Estrella on the ground that such compensation would not make it possible for a mayor to perform the duties of his office efficiently. In the absence of further opposition the matter is put to a vote and approved with the opposing vote of Mr. Estrella."

The writ petitioned for by the mayor was issued on June 28, 1927. The documents that contain the return fully confirm the facts stated in relation to the action of the mayor and the assembly regarding the municipal budget for the fiscal year 1927–28.

The assembly by its attorney made a motion to dismiss

on the ground that the mayor had no personality as such to institute certiorari proceedings wherein it appeared from the petition itself that the assembly had acted in accordance with the law; that the reduction in the salaries was within the powers of the assembly; that the petition did not state sufficient facts, and that in any case the right that the petitioner might have had prescribed when it was asserted.

On July 15, 1927, the case was submitted to the district court which rendered judgment in favor of the mayor on the 1st of the following October, setting forth in a methodical and complete opinion the grounds for its decision. The judgment in its dispositive part declares:

". . . . null and void the ordinance passed by the municipal assembly of Isabela on May 11, 1927, approving a budget of receipts and expenditures for the fiscal year 1927–28, which ordinance was again approved in the extraordinary session of that assembly held on the 26th of the month and year aforesaid, without special imposition of costs."

The assembly appealed and the appeal was heard on the 24th of February last. Although the appellee by his attorney made an oral argument at the hearing, he did not present a written brief, but filed a memorandum a few days after the hearing with the court's permission.

The first question to be considered is that of prescription. It has no support whatever. As shown by the record, the petition was filed in the district court of Aguadilla on June 25, 1927, and not on the 28th as alleged by the assembly in its motion to dismiss, and on that date the thirty days fixed by section 65 of the Municipal Law had not elapsed, for the assembly finally approved the budget on May 26, 1927.

The second question that arises is whether or not the petitioner in his capacity as mayor could resort to the courts in a certiorari proceeding for annulment of the ordinance.

Section 65 of the Municipal Law authorizing that remedy reads as follows:

"Section 65.—That on motion of the aggrieved party the district courts shall have jurisdiction—

"(a) To annul or review by writ of certiorari any legislative or administrative act of the municipal assembly, mayor or other municipal officer, which infringes the constitutional rights of the complainant or which is contrary to the Organic Act or the laws of Porto Rico;

"(b) To stay by injunction the execution of any ordinance, act, resolution or order which infringes rights guaranteed by the Constitution or Insular laws;

"(c) To compel by writ of mandamus a compliance with ministerial duties by municipal officials;

"(d) To grant, through ordinary action compensation for damages to parties injured by acts or omissions of municipal officials through malice or inexcusable negligence or ignorance;

"In the first two cases the aggrieved party may only bring his suit within the term of thirty days from and after the date on which the executive or administrative action shall have been performed or the ordinance, action, resolution or order published or communicated to the complainant."

That the court had jurisdiction of the case is clear. The right of the petitioner depends on whether or not he may be considered as an aggrieved party.

The petitioner was elected mayor of Isabela by the people in one of the general elections held in Porto Rico. The office of mayor is remunerated. The amount of the remuneration must be appropriated as salary in the budget. Sec. 35 of the Municipal Law, Laws of 1924, p. 94. The executive officers and employees of the municipality also should receive salaries. This is a case of services rendered by persons who give all or a great part of their time to it and usually live on the salaries paid to them for such services. It is conceivable that there might develop an economical situation so independent and a public spirit so enthusiastic that not only one but all of the officers of a municipal administration would serve gratuitously. But that would be so rare a case that it would be remarkable. We have had occasionally some examples where the office of mayor has been filled by

one who devoted his salary to other public needs. But even in such a case the salary always existed.

From the foregoing it is concluded that in order that a municipal administration may carry out its functions in the present condition of our social development, its officers and employees should receive an adequate compensation for their services. It is so prescribed by the law.

Apart from the material disadvantage which a mayor may suffer individually when his salary is fixed by the assembly at one dollar yearly, it is not possible to overlook the fact that as mayor answerable to the people for a good administration he is also injured 'thereby and the injury inflicted on him is the greater when he is not only deprived of his salary, but also of other means which are necessary for the performance of his duties, and it is more or less the same with other officers of the administration and several of the employees. And if we go a little deeper into the situation created by an assembly which suppresses necessary salaries and needful appropriations for public services, the conclusion might be that the real party injured was the community in general and in particular the elected municipal administration of which the mayor is the legal representative.

Therefore, under any aspect from which the case may be considered, the conclusion is that the mayor had personality as such to institute this proceeding. See *San Millán* v. *Municipal Assembly of Arecibo*, 32 P.R.R. 259. The following is taken from the syllabus:

"The petitioner in this case was elected Commissioner of Public Service, Police and Prisons, by a vote of seven to six of the members of the Municipal Assembly. It was discovered later that one of the assemblymen was disqualified because he was an alien. Subsequently the assembly met and declared the election annulled and the office vacant, and elected another person. The petitioner maintained that he was never lawfully removed and continued in the

active discharge of his duties. *Held*: That the petitioner is an aggrieved party with the right to a review as such by certiorari, under section 65 of the Municipal Law, of the action of the Municipal Assembly in declaring his election annulled.''

The certiorari proceeding authorized by the Municipal Law has been considered by this court in several cases as of a special nature, ample and proper so that the courts may intervene in an immediate and effective manner and review and annul, as the case may be, any legislative or administrative act of the municipal assembly, of the mayor or of other municipal officers which infringes the constitutional rights of the complainants or is contrary to the Organic Act or the laws of Porto Rico. And the acts committed by the Municipal Assembly of Isabela in this case are at least manifestly contrary to the Municipal Law of Porto Rico.

The foregoing conclusion goes to the merits of the case and this is what remains to be considered separately.

Leaving aside what was done by the assembly by the ordinance in question to the school director whose salary was fixed at ten dollars per month with a reduction in the appropriation for incidental expenses from $334.70 to $54.70, while all the appropriations connected with the office of the school inspector, an official appointed by the Insular Department of Education, were raised, without paying attention to other reductions in salaries and appropriations for services and without trying to inquire into the motives which led the assembly to act as it did, since that is forbidden grounds to the courts (*Piovanetti* v. *Municipal Assembly of Yauco,* 31 P.R.R. 496), it is sufficient for us to consider its action in regard to the mayor to reach the conclusion that the ordinance sought to be annulled is void because the law authorized the assembly to give life to the municipal government and not to destroy it, because the law empowered the assembly to fix

the salary of the mayor and not to remove him. If the assembly be acknowledged to have power to act as it did in the present case, it would have to be admitted that it had power to stop the government whimsically and to remove the mayor from office over the heads of the legislators, for no other construction could be given to the fixing at one dollar per year of the salary of the mayor and the appropriation of eleven dollars to be applied to keeping in condition the streets and municipal roads for one year, reducing besides by more than one-half the appropriations made and usually spent under the control of the mayor for school equipment and charities.

There is no doubt that under the law it is the function of the assembly to approve finally the budget and therefore to fix finally the salaries and appropriations, but its powers are not arbitrary. Under the government of law under which we live and which constitutes one of the greatest conquests of civilization the law must always prevail. The assembly was created by law to take part in the administration of municipal affairs, but not to obstruct and destroy the administration itself. If it should do so it goes beyond the law and its acts are void.

Jurisprudence on the matter is abundant. A quotation from Ruling Case Law in the opinion of the trial court reads that "When the municipal body has fixed the compensation its decision is not subject to judicial review, unless the salary of the officer is fixed at so low a figure that no competent person would accept the office." In 22 R.C.L. 531, we find in the note the case of *De Merritt* v. *Weldon* of California, reported also in 154 Cal. 545, 16 Ann. Cas. 955, and from the note at the foot thereof we quote the following:

"The rule appears to be well settled that a public body having the power to regulate the compensation attached to a particular of-

fice, but no power to abolish the office, cannot take away such compensation so as effectually to abolish the office. Reid v. Smoulter, 128 Pa. St. 324, 18 Atl. 445, 5 L.R.A. 517; State v. Nashville, 15 Lea (Tenn.) 697, 54 Am. Rep. 427. See also Morris v. Glover, 121 Ga. 751, 49 S. E. 786; People v. Howland, 17 App. Div. 165, 45 N.Y.S. 347, *affirmed* 155 N.Y. 270, 49 N.E. 775, 41 L.R.A. 838; White v. Auditor, 126 N.C. 570, 36 S.E. 132.

"In State v. Nashville, *supra,* the court said: 'If the mayor does his duty under this act he will not have time to engage actively in any other business. If the council can deprive the mayor and the board of public works and affairs of all compensation, then it has the power to so emasculate those departments of the government that all vigor and efficiency will be gone, and the government of the city will be left, practically, in the hands of the council. In such event the system of government provided by the charter act will be subverted and the intention of the legislature thwarted. It cannot be that so dangerous a power was intended to be lodged in the council.'

\*　　\*　　\*　　\*　　\*　　\*　　\*

"The reported case is in accord with the other decisions on the subject in holding that where a public body has the power to fix the amount of compensation attached to a particular office, but has no power to abolish the office, it cannot so far reduce the compensation as effectually to abolish the office. Bugg v. Sebastian County, 64 Ark. 515, 43 S.W. 506; State v. Shreveport, 124 La. 178, 50 So. 3; De Soto County v. Westbrook, 64 Miss. 312, 1 So. 352. See also Powell v. Durden, 61 Ark. 21, 31 S.W. 740.

"In State v. Shreveport, *supra,* wherein it appeared that the city council of the defendant city had reduced the compensation of the city auditor, an office established by its charter, from fifteen hundred dollars per annum, to three hundred dollars per annum, the court, in holding the reduction invalid, said: 'Where the constitution creates an office, the legislature cannot abolish or nullify it, either by direct or indirect means; and, where the legislature creates an office, a city council cannot abolish or nullify it, either by direct or indirect means. And, if either the legislature or a city council sought to do by indirection what it thus could not validly do directly, the duty of the courts to interfere would be perfectly plain.' "

The judgment appealed from must be affirmed.