11 COOKS, Judge.
Plaintiffs are Justices of the Peace, Constables, and the District Attorney, all duly elected public officials holding offices in/or for the Parish of Avoyelles. Several of the Justices of the Peace and Constables were elected and holding office at the time they qualified for re-election in July 1996; the others were seeking office for the first time. Eddie Knoll, then serving as District Attorney for Avoyelles Parish, also sought re-election to his position for a fifth six-year term. At the time the Justices of Peace and Constables qualifíed and were duly elected to hold office, the salary of those holding the offices they sought was fixed by the Avoyelles Parish Police Jury at $125.00 monthly. This amount was higher than the $30.00 statutory minimum the Police Jury was legislatively mandated to pay as provided by La.R.S. 33:1702 which states:
The police jury in all parishes having a population of over five thousand shall fix the pay of constables and justices of the peace and said salary shall not be less than thirty dollars per month.
| ¡When Eddie Knoll was elected to serve as District Attorney in 1972, La.R.S. 16:271 mandated the Avoyelles Parish Police Jury pay him, “in addition to the salary [now] paid him by the state, an annual salary of three thousand six hundred dollars, payable monthly on his own warrant. ...” In 1973, the Legislature enacted La,R.S. 16:14 entitled “Annual salary of district attorneys and assistant district attorneys payable by parishes,” to remove any restriction, limitation or ceiling which may have been interpreted or interposed as preventing the several parishes from paying district attorneys and their assistants additional salaries higher than the statutorily mandated minimum.[1] Although *163 the $3,600.00 minimum Avoyelles Parish was mandated to pay |3Eddie Knoll was not increased, La.R.S. 16:14 allows the Parish to pay him a higher supplement at its discretion. Through the years that followed, Avoyelles Parish Police Jury periodically increased the supplemental amount it paid Eddie Knoll annually from $3,600.00 to $24,000.00, the sum it was paying him at the time he qualified and was elected unopposed to serve a fifth term as District Attorney.
Subsequent to election but prior to commencement of the noted officials’ new terms of office, the Avoyelles Parish Police Jury met in December 1996 and proposed certain budget changes for the fiscal, year targeting for reduction the salaries of “all elected officials who would be sworn in to take office [beginning] January 1, 1997.” The proposed budget earmarked the salaries previously paid from the general fund to the District Attorney, Constables, and Justices of the Peace, reducing them to the minimum the Parish was legislatively mandated to pay these elected officials.[2] As a consequence, the Police Jury decreased the supplemental salaries of the Justices of the Peace and the Constables from $125.00 to $30.00 monthly and the District Attorney from $24,000.00 to $3,600.00 annually beginning January 1, 1997, the first day of their new terms of office.
On June 23, 1997, the Justices of the Peace and Constables filed suit “seeking restoration of their salaries, retroactive to January 1, 1997, the date the reduction became effective.” Specifically, they alleged “[t]he passage of the resolution of December 10, 1996, by the Avoyelles Parish Police Jury, [was] violative of [their] property rights and of the legislative intent of La.Const art.V, § 21 and art. X, § 23 Land/or reduce their salaries to a level where performance of their duties is impossible.” Normally, the District Attorney serves as the legal representative for the Police Jury; but, he elected to recuse himself and his assistants from all matters involving the Police Jury during the pen-dency of this dispute. Eventually, the Attorney General authorized the Avoyelles Parish Police Jury to retain private counsel to represent it. The District Attorney later filed an intervention petition also seeking “to restore his pay retroactive to the date of reduction.” In addition to echoing the allegations asserted in the principal suit, the District Attorney urged that the Polite Jury, by reducing his salary, deprived him of a property interest without due process.[3]
Answering the claims of plaintiffs, the Police Jury maintained its action was lawful and not in violation of any constitutional prohibition because “the salary [reductions were] prior to the takiny of office by these officials.” The Police Jury also sought injunctive relief requesting an order directing the “District Attorney’s oí- *164 fice to represent [it] in all matters other than those in which the District Attorney was a party.”
After hearing, the trial judge concluded the Police Jury’s action in reducing the salary of the noted public officials was not constitutionally impermissible because it did not “occur during the term of office, or after the official [had] taken the oath of office.” He then found the Justices of the Peace and Constables performed multiple functions “at all hours of the day and night” and “they would not have offered their candidacy had they been aware that their compensation would be so drastically cut,” so much so that the “travel expenses incurred in the performance of the duties might well exceed the amount to which their compensation had been reduced.” Borrowing 1 slanguage from State ex Rel. Thurmond v. City of Shreveport, 124 La. 178, 50 So. 3 (La.1909), cited in State ex Rel. Bass v. Mayor & Bd. Of Aldermen, 204 La. 940, 16 So.2d 527, 530 (1944), he reasoned the Policy Jury was not “at liberty ‘to abolish a statutory office or to starve out the incumbent’... prior to his being sworn into office.” The trial judge invalidated the Police Jury’s October 10, 1996 resolution and reinstated the Justices of the Peace and Constables compensation retroactive to January 1, 1997. However, he rejected Eddie Knoll’s request for relief “notwithstanding the validity of his complaint” finding “[t]he evidence showed that his funds aré such that his office can function.” Subsequently, the trial judge granted Eddie Knoll a new trial expressing concern that he may have overly focused on the funds available to the District Attorney rather than considering whether the reduction was “such that it would provide the District Attorney a sum entirely inadequate for his representation of the Police Jury.” He noted the other revenue he receives may be “for the myriad of other responsibilities and duties incumbent on this office.” When the trial judge revisited the matter involving Eddie Knoll, he voiced other misgivings about the Police Jury’s resolution. In addition to those mentioned as reasons for reconsidering his ruling, he stated: “I’m disturbed by some of the manner-the timing and fact that the salary had been established and then on the heels of the election you might say all this occurred without any meaningful hearing or anything like that.” He reinstated the District Attorney’s salary retroactive to January 1, 1997 finding, ultimately, the Police Jury’s action was “rather arbitrary.”
ASSIGNMENTS OF ERRORS
The Avoyelles Parish Police Jury appeals the trial court’s issuance of a Writ of Mandamus against it in favor of the Avo-yelles Parish Justices of the Peace, Constables, and District Attorney and assigns the following errors for our review:
1. The trial court erred in ruling that the Police Jury’s action to lower the ^salaries of the Justices of the Peace and Constables to the statutory minimum was improper.
2. The trial court erred in ruling that the Police Jury’s action to lower their salary of the District Attorney to the statutory minimum was improper.
3. The trial court erred in that the salary for the District Attorney was lower after the action of the Police Jury.
4. The trial court erred in ruling that the Police Jury’s rule for injunctive relief against the District Attorney, pertaining to his refusal to represent the Police Jury, was not properly brought before this court.
STANDARD OF REVIEW
The appellate standard of review is well known. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). If upon review, the appellate court finds a reversible error of law or a manifest error concerning the determination of a material fact made by the trial court, then the court is required to redetermine the facts de novo from the record and render a judgement on the merits. Rosell v. ESCO, 549 So.2d 840 (La.1989).
*165 LAW AND ANALYSIS
Justices of the Peace courts are constitutional offices exercising the judicial power of the State of Louisiana, and presiding justices are judges within the contemplation of the law. La. Const, art. V, § 20; Redwine v. State, 94-160 (La.App. 1 Cir. 12/22/94); 649 So.2d 61; In Re Wilkes, 408 So.2d 35 (La.1981); Quarles v. Jackson Parish Police Jury, 482 So.2d 833 (La. App. 2 Cir.), writ denied, 486 So.2d 750 (La.1986). La. Const, art. 5, § 21 provides that “[t]he term of office, retirement benefits, and compensation of a judge shall not be decreased during the term for which he is elected.” (Emphasis added). The District Attorney likewise is a constitutional officeholder within the judicial branch whose compensation shall not be decreased during the term for which he is elected. La. Const, art. V, §§ 26 and 31. (Emphasis added). Constables are elected public officials, and pursuant to La. Const. 17art. X, § 23 “[t]he compensation of an elected public official shall not be reduced during the term for which he is elected.” (Emphasis added). As the first circuit declared in Redwine, 649 So.2d at 63, “[although the legislature may enact laws regarding judges and elected public officials, the clear language of the Constitution prohibits the legislature from reducing the salary of judges and other elected public officials during their terms of office.”
In this instance, the Police Jury’s decision to reduce the public officials’ salaries occurred prior to the beginning date of their new terms of office. It is the timing of the decision and the “date it is to take effect,” the Police Jury maintains, that are critical in determining the applicability of the constitutional prohibition mentioned. Though the reductions were surely to take effect “during the elected public officials terms of office,” the Police Jury asserts it matters not because the decision to reduce the officials’ salary occurred prior to commencement of their new terms of office. The Police Jury insists the Constitution forbade it only from reducing the salaries of incumbents “during the term” they are then serving, not any new term they may be elected to serve; and it does not prohibit decisions to. reduce the salaries of newly elected public officials who have not taken the oath of office.
The important relationship of elected public officials’ compensation to their independence and ability to execute their duties in office is by no means a new idea initiated by the authors of La. Const, art. V, §§ 21 and 31 and art. X, § 23. Both the Compensation Clause and the Twenty-Seventh Amendment found in the United States Constitution embody this idea in protecting the salaries of federal judges, senators, and representatives during then-terms of office. The tortured and long history, predating adoption of these provisions, foretells the reasons for the framers enacting them. See Richard B. Bernstein, The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment, 61 Fordham L.Rev. 497 (1992); United States v. Will, 449 U.S. | «200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980). As Alexander Hamilton wrote in The Federalist No. 79, p. 491 (1818) (emphasis deleted): “In the general course of human nature, a power over a man’s subsistence amounts to a power over his will.” Americans in the 1770’s and 1780’s were keenly aware, from their familiarity with British history, that the framers of its constitution had neglected to adequately provide for and protect the compensation of elected officials. This led ultimately to extraordinary corruption in the British constitutional system and chained elected officials to the will of the King. In Will, the United States Supreme Court noted:
[T]he declaration of Independence, in listing the grievances against the King, complained:
‘He has made Judges dependent on his will alone, for the tenure of then-offices, and the amount and payment of their salaries.’
Will, 449 U.S. at 219, 101 S.Ct. at 482. Thus, the framers of our United States *166 Constitution knew well to guard against this “evil of democracy”[4] by including a prohibition in Art. Ill, § 1 specifically barring any diminution of judges’ compensation “during their Continuance in Office ;” and likewise, the Twenty-Seventh amendment recently adopted declares “[n]o law, varying the compensation for the services of Senators and Representatives, shall take effect, until, an election for Representatives shall have intervened.” U.S. Const, amend. XXVII. But this prohibition does not prevent increases in the compensation of these officials because as Hamilton later explained:
It will readily be understood, that the fluctuations in the value of money, and in the state of society, rendered a fixed rate of compensation ... in the Constitution inadmissible. What might be extravagant to-day might in half a century become penurious and inadequate. It was therefore necessary to leave it to the discretion of the legislature to vary its provisions in conformity to the variations in circumstances; yet 'under such restrictions as to put it out of \<,the power of that body to change the condition of the individual for the worse.
The Federalist No. 79, pp. 491-492 (1818). (Emphasis added).
Mindful of the historical impetus for adopting the federal compensation safeguards, we turn to address the specific provisions found in Louisiana’s Constitution likewise prohibiting the diminution of public officials’ compensation. First, we must decide whether the protection against reducing an elected public official’s salary “during the term for which he is elected ” begins when the official qualifies and is elected to. office or when he takes the oath of office? Because we find the date of election is decisive, we forego addressing the larger and more troublesome question: Whether the constitution also vests those incumbents, holding office on the date the Police Jury voted to decrease their pay, with a protected property right to the pay they were then receiving during their new terms of office which continues without a break in service?
A. The Police Jury’s General Fund Budget Cuts.
We begin by noting plaintiffs all qualified to hold various elective offices in July 1996. The primary election for the positions they sought occurred on September 21, 1996;. and, the general election occurred on November 5, 1996. Plaintiffs were either elected by a majority of the votes cast on the date of the primary election, or ascended to a new term of office unopposed on that date; the remaining plaintiffs were elected at the close of the general election. As mentioned, the Police Jury passed a resolution on December 10, 1996 to reduce the compensation of these officials effective on the date their new terms of office were to begin, which in this instance was January 1,1997.
The Police Jury contends because it “acted prior to any of the public officials [taking] office and applied their budget cuts to all those who [took] office as of ImJanuary 1, 1997,” plaintiffs’ salaries were not reduced “during the term” they were then serving but prior to the new terms they had not begun to serve. The latter occurrence, the Police Jury maintains, does not violate the constitutional prohibition against reducing the compensation of elected officials “during the terms for which [they] are elected.”
The Attorney General in addressing “whether or not the- salaries of the Justices of the Peace or Constables may be cut after they qualify or are elected, but before their terms of office begins,” stated:
A review of the notes to the constitutional convention regarding these statutes as well as the most applicable Louisiana cases such as Medlen v. State, 418 So.2d 618 (La.1982), reveals no clear prohibition of the salary of an elected official or judge being cut after they have qualified *167 or are elected but before their terms of office begin.
Op. Atty. Gen. 97-154, 4/30/97. The Police Jury relies on this opinion, and distinguishes Medien and Redwine, noting in both cases the courts found the decision to reduce the public official’s salary violative of the constitutional prohibition because it occurred and took effect “during the term” he was then serving. We agree the courts in Medlen&nd Redwine did not consider the specific issue before us: Whether the constitution also prohibits decisions to reduce a public official’s salary after he is elected but before the actual date his new term begins? However, we are not without jurisprudential guidance on this issue. And we are not, at all, convinced the absence of clear expression in the notes of the 1973 Constitutional Convention addressing this issue supports the Attorney General’s conclusion.
When the Supreme Court last considered the prohibition found in La. Const, art. V, § 21, it emphasized the phrase “for which he is elected,” and found the date then Associate Justice Pascal Caloge-ro was elected determined the length of his term of office. Calogero v. State ex rel. Treen, 445 So.2d 736 (La.1984). The Court held the |nl'921 Constitution, in effect on the date of his election, establishing a 14-year term for Justices serving on the Supreme Court, was controlling, not the 1974 Constitution reducing the term to 10 years. The intervenor in that case argued “Justice Calogero and the electorate knew, at the time of his election, that the new constitution would be in effect when this new term of office began; that because of this ‘notice,’ the electorate should have known it was electing the judge for a ten year term.” In dismissing this argument, the Court stated:
The election must be for a specific office with a specific term and specific powers; otherwise the people would be electing a candidate to an unknown office, with an unknown term and unknown powers. This certainty on the date of the expression of the popular will is an essential element in the maintaining of the legitimacy of popular elections in a democratic society.
[[Image here]]
The term need not commence on the date of the election, nor within any specific time thereafter, unless specially provided by law; but the length of the term and the powers of the office must be, and are, fixed on the date of thé election. The date of the assumption of the office has no relevance to’ the length of the term.... Their terms of office, however, were established on the date of the election....
[[Image here]]
The emphasis here is on the term for which elected, that term being the term under the old constitution, and for which he ran and was elected.... Hagrave, The Judiciary Article of the Louisiana Constitution of 197Jt, 37 La. L.Rev., 765, 823 (1977).
Calogero, 445 So.2d at 738-39 (citations and footnotes omitted). (Emphasis in original). Though that case involved the applicability of the 1974 Constitution in determining the now Chief Justice’s term of office, we deem its holding both instructive and dispositive in this case.
On the date the Justices of the Peace, Constables, and the District Attorney were |12elected to office their salaries were fixed, both by legislative statutes and Police Jury resolutions. The Police Jury could not reduce it thereafter “during the term for which [they] were elected.” As the Court found in Calogero, the emphasis here is on the term for which elected, not the date of assumption of the office. That the resolution was to “take effect” on January 1, 1997, the first day of their new terms of office, “has no relevance” in determining whether the constitution was violated. All the public officials were elected to serve a term of office at a fixed compensation *168 when the Police Jury adopted the resolution reducing their pay. The Police Jury’s action, thus, infringed on the protection afforded them by the Constitution.
We also have examined and find unpersuasive the second circuit holding in Smith v. Town of Cotton Valley, 584 So.2d 1199 (La.App. 2 Cir.), writ denied, 589 So.2d 1057 (La.1991). In that case, the court affirmed as constitutional a decision by the Board of Alderman for the Town of Cotton Valley reducing the Chief of Police’s salary between the date of his re-election and the commencement of his new term of office. In doing so, the court stated: “We are unaware of, and counsel has not cited, any cases in the jurisprudence interpreting the phrase ‘during the term for which he is elected.’ ” Town of Cotton Valley, 584 So.2d at 1201-02. Its failure to reference Calogero suggests the court did not consider the holding in that case. We note, further, the second circuit in addressing the purpose underlying adoption of the prohibition stated:
The obvious meaning of the prohibition against salary reduction is to prevent a vindictive board of aldermen from punishing an elected official by reducing his salary during the term he is presently serving. An elected official who has been elected but has not yet taken office may choose to decline acceptance of the office if the compensation is lowered to a level which, while reasonable, is beneath his expectation.
Id. at 1201-02.
|1sThe lessons learned by the framers of our United States Constitution from British history teaches us to view, with great skepticism, the court’s rationale. In the Seventeenth Century, Great Britain’s House of Common “gradually erected barriers that had the effect of excluding men without means from Parliament.” Before the Great Reform Bill of 1832:
... [Sjome candidates at first bid for their constituents’ approval and support by promising to take lower wages, and later raised the stakes by pledging not to accept wages altogether. The demand for seats in the House of Commons became so fierce during the eighteenth century that would-be members even found themselves assuming the cost for municipal improvements, such as new public buildings or repaved streets, in an effort to win the support of their constituents. Such largesse continued even after the adoption of the two great reform measures of 1832 and 1967(sic).
[[Image here]]
To the Americans, the ostentatious purchase of Parliamentary seats ... and the often blatant votebuying attending elections, even in legitimate boroughs containing Living-and-breathing constituents, exemplified the extraordinary corruption that tainted the British constitutional system. This corruption, they believed, led members of Parliament to override the Americans’ right under the British constitution.
Bernstein, 61 Fordam L.Rev. at 500-02 (citing 1 Edward Porritt with Annie G. Porritt, The unreformed House of Commons: Parliamentary Representation Before 1832, at vi (1909)).
Thus, “[i]n 1774, when the colonists convened the First Continental Congress, the colonial legislatures assumed the burden of paying their delegations.” Id. This practice continued in 1776 when the Second Continental Congress “began to assume the character and functions of an American legislature; and it continued after the framing (in 1777) and adoption (in 1781) of the Articles of Confederation.” Id. at 501-02. But,
[t]wo distinct but related developments, however, interfered with the states’ self-assumed responsibility for footing the bills of their delegations. First, state legislatures continued the practice, honored by tradition, of using their |14control on the pursestrings to punish Congress for ignoring their *169 state’s interests, and this fiscal war of nerves extended to the pay of state delegations. Second, as the nation’s economy worsened during and after the American Revolution, expenses closer to home assumed a greater importance for tight-fisted state legislators than expenses of a far-off and less relevant Confederation. In either case, the effect was the same: delegates to the Continental and Confederation Congresses had to wait longer and longer to be paid-if they were paid at all. Even those delegates who had independent means, and thus did not rely on the small salaries paid by the states, did not accept this situation lightly. Notable American politicians began to write scathing letters to their home states, demanding to know how long they were to serve their country without being paid for it.
Id. at 501-02 (footnotes omitted).
The follies of the ‘past eventually spawned adoption of the federal compensation guarantees found in our United States Constitution. There exists no shortage of excuses, some vindictive — others prompted by legitimate fiscal concerns, which might motivate those in control of the public purse to reduce the salaries of elected officials. But the “legitimacy of popular elections in our democratic society” demands that the public and the officials they elect know on the day of election that at least “during the term for which [the official] is elected” neither the compensation nor the term then fixed for the 'office will be decreased for any reason.
B. District Attorney’s Discretionary Fund Payments.
The Police Jury, alternatively, argues the District Attorney’s salary was not reduced as a result of the budget cuts because it later permitted the District Attorney to supplement his salary in the amount of $24,000.00 annually from his discretionary funds. It submits the District Attorney’s salary has “actually increased by more than $3,000.00 per year” because it also pays him, in addition, the $3,600.00 statutory minimum from its general funds. “Regardless of the source of the funds,” the Police Jury contends, “the District Attorney’s salary has not been reduced” and his argument 115thus lacks merit. On the other hand, the District Attorney points out he is the longest tenured district attorney in this State; he has an “Av [rating] in Martindale Hubble;” and he expected to receive the $24,000.00 from his discretionary funds in addition to the $24,000.00 the Police Jury paid him from its general funds before the cuts. In brief, the District Attorney relates:
During January, 1997, and without knowing that the Police Jury had cut his salary, [he] called the President of the Avoyelles Parish Police Jury, Mr. V.W. Cole and told him how much he appreciated what the Police Jury was doing in permitting him to provide his discretionary funds to supplement the pay of his staff, and further requested permission to send an additional $2,000.00 per month to supplement the salary of the District Attorney. President Cole agreed, and did in fact confirm same with the Avoyelles Parish Police Jury as per its Resolution adopted at its regular meeting on February 11,1997.
We have examined the Police Jury’s February 11, 1997 minutes and note the only reference to the District Attorney’s salary reads as follows:
Eddie Knoll, District Attorney, addressed the Jury concerning the cut in his salary that the Jury made effective January 1, 1997. He requested that the Jury reinstate his salary and also all of the other people that have been cut. President Cole asked that a Finance Committee meeting be held to address this request.
We simply cannot determine from this minute extract or the record as a whole whether the Jury intended to raise the District Attorney’s salary when it agreed to allow him to supplement it by $2,000.00 per month from his discretionary funds. The record, thus, is incomplete and we *170 cannot adequately review the contentions raised by the Jury and District Attorney. Accordingly, we elect to remand the case for presentation of additional evidence and hearing before the court below to specifically address whether the Police Jury intended to increase the District Attorney’s supplemental pay by $2,000.00 per month, or agreed to allow him to use his discretionary funds to restore the amount it previously cut by virtue of the earlier budget resolution. If the Police Injury intended to allow an increase in the District Attorney’s supplemental pay when it approved his request, then it is not entitled to offset the $2,000.00 per month paid from his discretionary funds.
C. Assignment of Assistant District Attorneys to Represent Police Jury.
Finally, we turn to address the Police Jury’s fourth assignment of error. The trial judge considered several matters raised by the parties prior to trial. He rejected the Police Jury’s request for an order directing the District Attorney’s assistants to represent it in these proceedings finding the assistants’ representation in this case would be suspect and might cause the assistants “[t]o look squintingly like a strabysmus: One eye on the client and one eye on the boss.” He also opted not to proceed on the broader issue of whether the District Attorney and his assistants owe a legal duty to represent the Police Jury on unrelated matters during the pendency of this action. Instead, he ruled this issue should be tried separately. The Police Jury did not assign as error the trial judge’s refusal to order the District Attorney or his assistants to represent it in this action; instead, they urge only “in cases that have nothing to do with the District Attorney as a party he should not be allowed to avoid his statutory obligation .... [or] at the least, an assistant D.A. should be assigned to represent the Police Jury.” Because the trial judge has not ruled on this issue, we cannot review it on appeal.
DECREE
For the foregoing reasons, the judgment of the trial court ordering the Avoyelles Parish Police Jury to retroactively reinstate the compensation of the Justices of the Peace, Constables, and District Attorney in effect on the date of their election to office is affirmed. The case is remanded for further proceedings to determine whether the Police Jury is entitled to offset against this judgment, the amount paid the District l17Attorney from his discretionary funds.
AFFIRMED IN PART AND REMANDED IN PART.
WOODARD, J., concurs and assigns reasons.

. La.R.S. 16:14 provides:
A. Notwithstanding any provisions of the law to the contrary, there shall be no restriction, limitation, or ceiling placed on the amount of additional salary that may be paid to a District Attorney or an Assistant District Attorney by the governing authorities of the several parishes of the state as provided for in R.S. 16:10 and R.S. 16:11.
B. The amounts of additional salaries paid to District Attorneys and Assistant District Attorneys as of August 1, 1973, by the governing authorities of the several parishes of this state as additional salary, shall be construed as the minimum amounts that shall be paid as additional salaries to the said respective District Attorneys and Assistant District Attorneys by the governing authorities of the several parishes of this state.
C.The provisions of this section shall not be construed to repeal, supersede, or affect any existing law or laws or provisions of *163 any statutes which have been enacted or may be enacted by the legislature fixing the compensation to be paid to District Attorneys or the Assistant District Attorneys throughout the state by the governing authorities of the several parishes of the state, provided, however, that provisions of this section are to be construed in removing the restriction, limitation, or ceiling which may previously have existed on the amount of additional salary that the governing authorities of the several parishes of this state could pay to District Attorneys and Assistant District Attorneys, and further, has created a minimum additional salary which shall be paid by the governing authorities of the several parishes of this state to District Attorneys and Assistant District Attorneys as additional salary, which minimum shall be that amount paid by the respective governing authorities of the. several parishes of this state to the District Attorneys and Assistant District Attorneys in their parishes on August 1, 1973. (Emphasis added).

. The list also included the city judges and ward marshals.

. Particularly, the District Attorney alleged "[t]he Police Jury’s reduction of [his] salary, without notice or a hearing, completely disregarded [his] constitutional protections afforded by procedural due process;” and, further "violated [his] due process because there was no neutral and detached decision maker involved in the action.”

. See the Records of the Federal Convention of 1787, at 48 (Max Farrand ed., 1937).